IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
---------------------------------------------------x
                                           :
                                           :
IN THE MATTER OF THE EXTRADITION           :        CIV. NO.  15 MJ 157 (JGM)
OF MANEA ORTANSA MIRELA[1]                 :
                                           :
                                           :        DATE: MARCH 1, 2018
---------------------------------------------------x
```

RULING ON REQUEST FOR EXTRADITION

On August 14, 2015, this Magistrate Judge signed a complaint and arrest warrant for

the arrest of Manea Ortansa Mirela ["Manea"],[2] in accordance with the Extradition Treaty

between the United States and Romania, and 18 U.S.C. § 3184.  (Dkt. #1).[3]  The complaint

charges Manea with convictions, in absentia, of the following offenses:

> (a) deceit in a continued form, offense provided by article 215(2) and (3) of
> the Criminal Code of Romania with the application of article 41(2), article 42
> in conjunction with  article 34 and article 13 of the Criminal Code of Romania;
>
> (b) the offense provided by article 40 of Law 82/1991 on accountancy, in
> relation to article 289 of the Criminal Code of Romania, with the application
> of article 41(2) of the Criminal Code of Romania;
>
> (c) forgery of documents under private signature provided by article 290 with

---

[1]See note 2 infra.

[2]In official documents in Romania, a person's surname (here, Manea) usually appears
before his or her given names (here, Ortansa Mirela).  Romanian Names, WIKIPEDIA (last visited
Feb. 24, 2018); A Guide to Names and Naming Practices -- Romania, www.fbiic.gov (March
2006)(Last visited Feb. 24, 2018). At times, Manea is also referred to in court filings by the
surnames of her former husbands, Porto or Neagu.

[3]Attached to the criminal complaint is a copy of the Declaration of Susan R. Benda of the
Department of State, sworn to November 20, 2014 ["Benda Aff't"], with copies of notes, and a
copy of the Extradition Treaty attached thereto ["Extradition Treaty"].  Attached as Exh. 1 is a copy
of the Request for Extradition, attached to which is a History of the Case, dated March 22, 2012,
and the applicable legal provisions (Att. A); copy of decision from Bucharest Sector 3 Court of Law
Closure, dated January 25, 2001 and copy of decision from Bucharest Sector 3 Court of Law
Criminal Sentence No. 150, dated February 1, 2001 (Att. B); copy of Warrant of Imprisonment
Penalty, dated March 5, 2001 (Att. C); and copy of request for criminal record, dated March 22,
2001 (Att. D).

application of article 41(2) of the Criminal Code of Romania;

(d) forgery in statements, provided [by] article 292 of the Criminal Code of Romania;

(e) using bad faith of the loans of the company to the personal interest, provided by article 194(5) of the Law 31/1990 on the commercial companies with the application article 41(2), article 42, article 34, and article 13 of the Criminal Code of Romania;

(f) forgery, provided by article 291 of the Criminal Code of Romania, with the application of article 41(2) of the Criminal Code of Romania.

(Id. at 1-2).   Manea was convicted of submitting fraudulent documents to several Romanian financial institutions, including Bancorex SA, the International Bank of Religions, and Bankcoop SA, in order to obtain loans that Manea did not repay and that she used for her personal interest.  (See Dkt. #1, Att. B).[4]  Two other co-conspirators were charged: Ciocan Marian, Manea's associate and director of SC Bravo MM'95 SRL, and Zega Macedon Anton, the deputy director of SC Bancorex SA – Lipscani branch.  (Id.).   On February 1, 2001, Manea was sentenced to nine years' imprisonment, and on March 5, 2001, a warrant of imprisonment was issued from the Bucharest Sector 3 Court of Law, but was not executed "as the defendant eluded the execution of the penalty [by] being located [i]n the territory of the United States of America."  (Dkt. #1, at 2).

Manea was arrested in this district on August 14, 2015, and presented before this United States Magistrate Judge (Dkt. #4); the same day, the Federal Public Defender's Office was appointed to represent Manea.  (Dkt. #6).   Manea was released on bond with her employer along with her husband, Paul Neagu, to serve as third-party custodians. (Dkts. ##

---

[4]Bancorex declared that Manea failed to pay back three loans of 900,000,000 Romanian lei, 400,000 Deutsche Marks, and 645,000,000 Romanian lei; International Bank of Religions declared that Manea failed to pay back two loans of 252,715,292 Romanian lei and 920,000,000 Romanian lei, including interest; and Bankcoop SA declared that Manea failed to pay back two loans of 87,791,939 Romanian lei and 354,546 Deutsche marks, including interest. (Id.).

7-8). On August 20, 2015, after a hearing before this Magistrate Judge, the Order Setting Conditions of Release was amended to include three additional co-signors for her bond and a third-party custodian from her workplace. (Dkts. ##12-13, 17). On October 26, 2015, this Magistrate Judge granted the parties' Joint Motion to Modify Conditions of Release/Bond such that Neagu was released as a third-party custodian as the parties were separated due to "marital difficulties[,]" and Neagu's employer was released as one of the co-signors of the bond in light of the dissolution of the relationship between Manea and Neagu. (Dkt. #21, at 1-2; Dkt. #22).

On November 20, 2015, the Connecticut Superior Court issued a restraining order in favor of Manea against Neagu following a hearing concerning domestic abuse. (Dkt. #23, at 2). On February 8, 2016, the parties jointly moved to have Neagu removed as a co-signor to Manea's bond, and to add to additional co-signors to the bond. (Id.). The parties' motion was granted the same day. (Dkt. #24).[5]

On August 2, 2016, the Government filed the pending Motion for Extradition. (Dkt. #32).[6] This Magistrate Judge held a telephone conference nine days later, on August 11,

---

[5]Manea has been compliant with her conditions of release and has been granted modifications several times over the past two years. On April 4, 2016, the Court granted the parties' Consent Motion to Modify Condition of Release/Bond on April 4, 2016, permitting Manea to attend Romanian Orthodox Easter services in Middletown, NY. (Dkts. ##28-29). On November 10, 2016, Manea was granted permission to attend an out-of-state graduation ceremony (Dkts. ##45-46), and on December 1, 2016 and February 17, 2017, Manea was granted permission to attend additional Romanian Orthodox services. (Dkts. ##50-51, 58-59). Similarly, on February 17, 2017, she was granted permission to attend a 50th wedding anniversary celebration of a close friend. (Dkts. ##58-59). On April 5, 2017, Manea was granted permission to attend Palm Sunday and Easter services. (Dkts. ##63-64). On May 4, 2017 and again on October 24, 2017, Manea was granted permission to travel to New York for educational classes and her final exams. (Dkts ##65-66, 70-71). On September 8, 2017 and again on December 20, 2017, she was granted permission to travel to Rhode Island, Vermont, and Virginia for brief family vacations. (Dkts. ##68-69, 72-73).

[6]Attached to the Government's Motion is another copy of decision from Bucharest Sector 3 Court of Law Closure, dated January 25, 2001 and copy of decision from Bucharest Sector 3 Court

2016, during which the extradition hearing was scheduled for December 6, 2016 (Dkts. ##33, 36-37; see also Dkts. ##34-35), and then rescheduled to January 18, 2017 (Dkt. #44; see also Dkts. ##42-43), and at the request of counsel (Dkts. ##47-48), rescheduled again to March 22, 2017. (Dkt. #49).

On October 24, 2016, defendant filed her brief in opposition to the Government's Motion for Extradition, with multiple exhibits attached. (Dkt. #38;[7] see also Dkts. ##39-41). On January 18, 2017, the Government filed its reply brief, with multiple exhibits in support. (Dkt. #52;[8] see Dkts. ##42-43, 47-48). On February 17, 2017, defendant filed a sur-reply brief (Dkt. #60;[9] see Dkts. ##56-57), and on February 24, 2017, the Government filed a

_____

of Law Criminal Sentence No. 150, dated February 1, 2001.

[7]Attached to defendant's brief are the following exhibits: Affidavit of Ortansa Mirela Manea, sworn to October 21, 2016 (Exh. A); a copy of Manea's Romanian passport with U.S. visa (Exh. B); copy of Certified Report from the Romanian Ministry of Justice (Exh. C); copy of Immigration and Naturalization Service I-94 Departure Record (Exh. D); copy of Manea's social security card (Exh. E)(Sealed)(see Dkts. ##39-41); copy of I-94 Notice of Action (Exh. F); copy of New York State Certificate of Marriage Registration for Manea and Anthony F. Porto (Exh. G); copy of green card (Exh. H); copy of letter from Attorney Joseph A. Sena, Jr., dated October 21, 2016 (Exh. I); copy of Certificate of Naturalization (Exh. J); copy of letter from Clifford Heidinger, D.V.M. and Mark B. Heidinger, dated April 14 and 11, 2016, respectively (Exh. K); copy of Restraining Order, dated November 20, 2015 (Exh. L); copy of excerpt from Memorandum of Decision in divorce action, dated June 21, 2016 (Exh. M); letters in support from twenty-five individuals (Exh. N); copy of letter from Embassy of Romania to the United States, dated May 21, 2012 (Exh. O); copy of expert report from Attorney Adrian Mitrea, translated by Attorney Andrei-Stefan Mitrea, dated October 3, 2016 (Exh. P); copy of affidavit of Attorney Tiberiu Dianu, sworn to October 10, 2016 (Exh. Q); and copy of medical record, dated October 5, 2011 (Exh. R)(Sealed)(see Dkts. ##39-41).

[8]Attached to the Government's reply brief are the following exhibits: Supplemental Submission from Romania, dated November 22, 2016 (Exh. 1)(Sealed)(see Dkts. ##53-55); Original Extradition Request and Attachments, in Romanian, dated April 23, 2012 (Exh. 2); Supplemental Submission from Romania, dated April 27, 2016: Forensic Accountant's Report, dated January 25, 2001; witness statements; and statement by Manea on October 9, 1995 (Exh. 3); Supplemental Submission from Romania, dated October 4, 2016: correspondence from the Romanian Court of First Instance of Sector 3 Bucharest, in Romanian with English translation (Exh. 4); and Supplemental Submission from Romania, dated January 16, 2017: correspondence from the Local Court of Sector 3 Bucharest, in Romanian, with English translation (Exh. 5).

[9]Attached as Exh. S is a supplemental declaration of Attorney Tiberiu Dianu, dated February 13, 2017.

copy of both the Romanian and English versions of the Romanian indictment.  (Dkt. #61).[10]

A hearing was held pursuant to 18 U.S.C. § 3184 on March 22, 2017.  (Dkt. #62).

For the reasons set forth below, the Government's Motion for Extradition (Dkt. #32) is granted.

## I. DISCUSSION

### A. PROCEDURAL BACKGROUND

The lengthy procedural history of this case, which began twenty-two years ago, is detailed in an attachment to Romania's Request for Extradition (Dkt. #1, Request for Extradition, Att. A), and supplemented by the parties' briefs.  (See Dkts. ##32, 38, 52, 60).

Manea was born in 1963 in Pantelimon, Ilfov Country, Romania.  (Dkt. #38, at 19).[11] After Manea completed high school, she attended veterinary school, married and divorced, and then gave birth to her only son in 1989, the product of a subsequent relationship which ended shortly after her son was born.  (Id. at 22-23).

An investigation began in 1996 regarding claims that from 1994 to 1996, Manea defrauded various banks in conjunction with receiving loans for her companies, "Bravo MM '95 Impex" and "Ando Exim" LLC.  (See Dkt. #32, at 4; Dkt. #1, Request for Extradition, Att. A at 7).  Specifically, according to Romanian documents, between October 1994 and August 1996, Manea used forged documents to mislead Bancorex SA, International Bank of Religions, and Bankcoop SA, to secure seven loans for her companies.  (Dkt. #1, Request for Extradition, Att. A at 7).  On September 3, 1996, Manea provided her first written

_____

[10]Specifically, attached to Dkt. #61 is a certified copy of the indictment issued for defendant, dated December 23, 1997, in Romanian, with English translation.

[11]The page numbers of the briefs and exhibits as cited to in this Ruling correspond to the page numbers assigned by CM/ECF.

statement to investigative authorities arising out of a series of loans taken by Manea from October 1994 to August 1996.  (Id. at 1-2).  On February 6, 1997, Manea provided a "new written statement with regard to the offen[s]es" (id. at 1)(emphasis omitted), and one month later, on March 4, 1997, after providing two pictures, a copy of her birth certificate, proof of residency in Romania, and her police certificate, referred to as a cazier judiciar[12] from the police department, Manea received a visa to travel to the United States.  (See Dkt. #38, Exh. A ¶¶ 4, 10 & Exh. B).[13]

On March 17, 1997, Manea left Bucharest and traveled to Hungary, and on April 8, 1997, plaintiff flew from Hungary to John F. Kennedy International Airport in New York City. (Dkt. #38, Exh. A ¶¶ 16, 18, 20).  She was granted a temporary stay in the United States from April 8, 1997 to October 7, 1997 (see id. ¶ 21 & Exh. D), and within a few days of her arrival in Philadelphia, she applied for and received a driver's license and a temporary social security number.  (Dkt. #38, Exh. A ¶ 22 & Exh. E).

Around the same time, on April 23, 1997, "investigative authorities [in Romania] issued a report stating the search activities undertaken against the defendant in view of her identification hearing and arrest." (Dkt. #1, Request for Extradition, Att. A at 6)(emphasis omitted). The Prosecutor's Office of the Supreme Court of Justice in Romania "issued in [Manea's] absence[,] the preventative arrest warrant no. 37.120.05.1997 and the national and international search procedure was triggered against her." (Id. at 6-7)(emphasis

---

[12]A cazier judiciar is obtained at police precincts in Bucharest, and at local police precincts in the city of residence or city of birth, and such document details prior criminal history. See https://travel.state.gov/content/visas/en/fees/reciprocity-by-country/RO.html  (Last visited March 23, 2017).

[13]Manea's visa, issued on March 4, 1997, erroneously identifies her gender as male. (Dkt. #38, Exh. B).

omitted).[14]  Similarly, the "initiation of the criminal action . . . began against the accused Manea . . . , by the Ordinance from May 12, 1997." (Id. at 7)(emphasis omitted).  A second "report of initiation of criminal prosecution" was issued on June 5, 1997.  (Id. at 6)(emphasis omitted).  An indictment issued against Manea on December 23, 1997. (Dkt. #61).[15]  Two other co-conspirators, Ciocan Marian and Zega Macedon Anton, were also charged.  (Dkt. #32, at 5).

On March 11, 1998, the investigative authorities in Romania issued a "report of initiation of criminal prosecution[.]" (Dkt. #1, Request for Extradition, Att. A, at 6)(emphasis

_____

[14]In a "Report" included in the Request for Extradition, the Ministry of Justice of Romania recites that "defendant eluded investigations after she gave the first statements, reasons for which the General Prosecutor's Office of the Supreme Court of Justice issued in her absence the preventive arrest warrant no. 37/120.05.1994 and at the same time national and international search was triggered." (Dkt. #1, Request for Extradition, Att. A at 16).   The number of the preventive arrest warrant is identical to the warrant referenced in the "History of the Case" but states the year as 1994 instead of 1997.  The "Report" continues that the criminal action against Manea was initiated in 1997.  (Id.)(emphasis added).  Additionally, the indictment references "the preventive arrest warrant no.37/ 12 May 1997[.]" (Dkt. #61).  Based on the foregoing, the reference to 1994 instead of 1997 appears to be a typographic error.

[15]The February 1, 2001 court decision states:

        With regard to the defendant Manea Ortansa Mirela, having in view the fact that the criminal prosecution was undertaken in her absence because she eluded the justice, the Court ordered the issuing of an address to the attention of the Directorate for Evidence of Persons in order to identify her actual home address.  The Court summoned her to the address communicated by the Directorate of Evidence of Persons also issuing an Order to appear in front of the Court.  From the report completed on this occasion it resulted that the defendant was missing from her residence for approximately [one] year, her new address being unknown.  Therefore[,] the Court ordered her summoning by posting the subpoena on the door of Sector 5 Local Council according to the provisions of art. 177 (4) final thesis.  Because the criminal activity of the defendant was developed in various places the Court ordered for the subpoena to be posted to the headquarters of the Local Council of the Prosecutor's Office of the Supreme Court of Justice who completed the criminal prosecution, more precisely sector 5 (were also taken into consideration the headquarters of the three civil parties that are located in different areas of Bucharest – sector 3 for Bancorex SA and Bankcoop SA and sector 4 – International Bank of Religions.

(Dkt. #1, Att. B at 24-25).

omitted).  On March 19, 1998, Manea married Tony Porto and moved into his home in New York.  (Dkt. #38, Exh. A ¶ 24 & Exh. G).[16]  An extension of her stay in the United States was approved on April 8, 1998.  (Dkt. #38, Exh. F).

Manea, Ciocan Marian, and Zega Macedon Anton had a joint trial; Ciocan Marian and Zega Macedon Anton were present with counsel, while Manea was neither present nor had counsel to represent her interests.  (Dkt. #32, at 5).  On February 1, 2001, the Bucharest Court issued a decision, which convicted Manea and sentenced her to nine years' imprisonment.[17]  (Dkt. #1, Att. B at 23-53 & Att. C at 60-61).

After marrying Porto, Manea obtained a green card, further extending her stay in the United States to May 10, 2001. (Dkt. #38, Exh. A ¶ 24 & Exh. H). On March 5, 2004, Manea became a naturalized citizen of the United States.  (Id. & Exh. J).[18]

Pursuant to a request of the Ministry of Administration and Interior in Bucharest, Romania, the Bucharest Police General Directorate – Criminal Investigations Division issued two warrants for Manea: a European arrest warrant, dated May 8, 2009, and an international search warrant, dated May 8, 2009, for the purpose of imposing "the custodial sentence execution based on the custodial sentence execution warrant No. 295/March 5th, 2001." (Dkt. #52, Exh. 1 at 10-11).

---

[16]The marriage license indicates the date of the wedding was March 19, whereas Manea indicates that the wedding date was March 20.

[17]In the indictment, it is noted that Ciocan Marian "admitted having committed the offen[s]es[,]" and that Zega Macedon Anton "did not recognize having committed the offen[s]e[,]" but that his "defense cannot be taken into account . . . ."  (Dkt. #61-1, at 70).

[18]United States Citizenship and Immigration Service "conducts an investigation of the applicant upon his or her filing for naturalization.  The investigation consists of certain criminal background and security checks[,]" including collecting fingerprints and requesting a "name check" from the Federal Bureau of Investigations. See 8 C.F.R. § 335.1 Investigation of applicant; https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume12-PartB-Chapter2.html (Last visited March 23, 2017).

Manea and Porto divorced on March 20, 2011; however, despite the dissolution of their marriage, they remained close friends. (Dkt. #38, at 29). In 2012, Manea married Paul Neagu. (Id.).

On February 29, 2012, the Romanian Embassy to the United States communicated Manea's address in Patterson, NY, and noted her name change to Porto Ortansa Mirela. (Dkt. #52, Exh. 1, at 11, 14-15). A month later, on March 1, 2012, Manea was identified in the United States, and the next day, a decision was issued by the Bucharest 3rd Urban District Court to forward a request to the Ministry of Justice for Manea's extradition to Romania. (Id. at 11). The Request for Extradition from the Ministry of Justice to the United States Department of Justice, Office of International Affairs, is dated April 23, 2012. (Dkt. #1, Exh. 1). The Department of Justice transmitted the official Romanian extradition request to the District of Connecticut in March 2015 (Dkt. #32, at 6), and, as discussed above, Manea was arrested on August 14, 2015 and presented before this U.S. Magistrate Judge (Dkt. #4); she was released on bond and has remained on bond to the present. On June 21, 2016, Neagu and Manea divorced.[19] (Dkt. #38, Exh. M).

B. PRINCIPALS OF EXTRADITION LAW

Extradition of fugitives from foreign countries is governed by 18 U.S.C. § 3184 which provides in relevant part:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, . . . may, upon complaint made under oath, charging any person found within his [or her] jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his [or her] warrant for the apprehension

---

[19]Neagu was abusive to Manea (see Dkt. #38, Exh. M, N14 & R); on November 20, 2015, Manea obtained a protective order against him. (Id., Exh. L).

9

of the person so charged, that he [or she] may be brought before such justice, judge, or magistrate judge . . . of the United States District Court . . . .

18 U.S.C. § 3184.[20]  The court must hold a hearing to determine whether "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty or convention . . . ."  Id.  The court's inquiry is "confined to the following: whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof."  Cheung v. United States, 213 F.3d 82, 88 (2d Cir. 2000), citing Lo Duca v. United States, 93 F.3d 1100, 1103-04 (2d Cir.)(additional citation omitted), cert. denied, 519 U.S. 1007 (1996).  If the Court finds the evidence sufficient, the Court "shall certify the same, together with a copy of all the testimony taken before him [or her], to the Secretary of State[.]" 18 U.S.C. § 3184.  "At that point, the Secretary of State has final authority to extradite the fugitive, but is not required to do so."  Lo Duca, 93 F.3d at 1103; Cheung, 213 F.3d at 88 (after the Court completes its inquiry, the Court "shall certify" the extraditability of the fugitive to the Secretary of State, who "has sole discretion to weigh the political or other consequences of extradition and to determine finally whether to extradite the

---

[20]In presiding over extradition matters, "the magistrate judge is not exercising the judicial power of the United States under Article III of the Constitution.  Instead, the magistrate judge is exercising a special authority delegated to the judiciary by Congress, namely the authority to decide whether to certify extraditability to the Secretary of State, who holds the ultimate power to extradite at [his] discretion."  In the Matter of the Extradition of Zhenly Ye Gon, 613 F. Supp. 2d 92,100-01 (D.D.C. 2009), citing Austin v. Healey, 5 F.3d 598, 603-04 (2d Cir. 1993), cert. denied, 510 U.S. 1165 (1994); see also In re Mackin, 668 F.2d 122, 125-30 (2d Cir. 1981)(orders certifying extraditability are non-appealable because they do not emanate from constitutional courts); Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 CORNELL L. REV. 1198, 1206-09 (1991).

In this case, the parties do not contest this Magistrate Judge's authority to conduct this proceeding, nor does Manea contest this court's jurisdiction as Manea was found and arrested in Connecticut.

fugitive."). However, the "Executive Branch retains plenary discretion to refuse extradition." Lo Duca, 93 F.3d at 1103-04.

"The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." Collins v. Loisel, 259 U.S. 309, 316 (1922)(multiple citations omitted). The extradition hearing is "essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and [her] surrender to the demanding nation." Ward v. Rutherford, 921 F.2d 286, 287 (D.C. Cir. 1990)(citation & internal quotations omitted), cert. dismissed sub nom. Ward v. Attride, 501 U.S. 1225 (1991). Accordingly, "extradition proceedings are not to be converted into a dress rehearsal trial[,]" Jhirad v. Ferrandina, 536 F.2d 478, 484 (2d Cir.)(citation omitted), cert. denied, 429 U.S. 833, reh. denied, 429 U.S. 980 (1976), and it "is well to remember that [the fugitive's] ultimate culpability will not be determined in the United States." Id.; see also id. at 482 ("Orders of extradition are sui generis. They embody no judgment on the guilt or innocence of the accused but serve only to insure that [the fugitive's] culpability will be determined in another and, in this instance, a foreign forum.").

"Thus, evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the [Magistrate Judge's] hearing." Shapiro v. Ferrandina, 478 F.2d 894, 901 (2d Cir.), citing Charlton v. Kelly, 229 U.S. 447, 456 (1913), cert. dismissed, 414 U.S. 884 (1973). Additionally, the defendant in an extradition proceeding "may not proffer evidence to contradict the showing of the requesting state. . . . Defendant's simple denials of responsibility as a matter of fact are therefore inadmissible in this proceeding." In the Matter of the Extradition of Harold Glantz, No. 94 Crim. Misc. 1

P. 25, 1995 WL 495644, at *13 (S.D.N.Y. Aug. 21, 1995); see also Collins, 259 U.S. at 316 (evidence properly excluded related strictly to the defense, as the "function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction[]")(multiple citations omitted).  As the Second Circuit has "stressed . . . , '[w]hat is at issue in the proceeding . . . is not punishability but prosecutability.'" Skaftouros v. United States, 667 F.3d 144, 155 (2d Cir. 2011), quoting In re McMullen, 989 F.2d 603, 611 (2d Cir. 1993)(emphasis added).

"Judicial officers considering extradition requests . . . should not engage in an analysis of the demanding country's law and procedure, except to the limited extent necessary to ensure that the requirements of the federal extradition statute and the applicable extradition treaty have been satisfied."  Id. at 156.  This directive is consistent with the principles of international comity, see Jhirad, 536 F.2d at 484-85 ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based.")(citation omitted), and judicial modesty, as "U.S. courts are strongly discouraged from reviewing whether the demanding country has complied with its own law and, indeed, it is error to do so except to the limited extent necessary to ensure compliance with the applicable extradition treaty."  Skaftouros, 667 F.3d at 156 (citations omitted).

### C. U.S.-ROMANIAN EXTRADITION TREATY & AUTHENTICATION OF DOCUMENTS

The extradition statute, 18 U.S.C. § 3184, provides for extradition when "there is a treaty . . . for extradition between the United States and any foreign government[]"

requesting extradition. In this case, Susan R. Benda, an Attorney-Advisor in the Office of the Legal Adviser for the Department of State, attests to the existence of the Extradition Treaty in full force and effect between the United States and Romania. (Dkt. #1, Benda Aff't ¶ 2). The Extradition Treaty between the United States and Romania was signed on September 10, 2007. (Id. ¶ 3). The parties in this case do not contest the authority of this court to conduct this extradition proceeding,[21] nor do they contest that this court has personal jurisdiction over Manea, who was found in Connecticut. Additionally, the parties do not contest that there is a treaty in full force between Romania and the United States. Thus, at issue is whether the crimes with which Manea was charged in Romania are covered by the Treaty and whether probable cause exists.

The evidence submitted by Romania along with its Request for Extradition (see Dkt. #1) has been authenticated in accordance with 18 U.S.C. § 3190, which requires that "the principal diplomatic or consular officer of the United States resident in such foreign country" certify as to the documents' authenticity. "Once that authentication has occurred, '[t]he usual rules of evidence do not apply' and the only requirement for admission of the evidence is that it be authenticated.'" In re Zhenley Ye Gon, 768 F. Supp. 2d 69, 90 (D.D.C. 2011), quoting Manta v. Chertoff, 518 F.3d 1134, 1146 (9th Cir. 2008). Pursuant to the terms of the Extradition Treaty, the Embassy of Romania submitted Diplomatic Note 1289, dated May 21, 2012, formally requesting the extradition of Manea, as well as Diplomatic Note 3355, dated November 6, 2014, providing additional information to supplement its request. (See Dkt. #1, Exh. 1 at 5-6; id., Benda Aff't ¶ 2). Additionally, Article 10 of the Extradition Treaty provides that the "[d]ocuments that bear the certificate of the Ministry or Department of

---

[21] See note 20 supra.

Justice, or the Ministry or Department responsible for foreign affairs[] of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization." (Dkt. #1, Extradition Treaty, Art. 10). Article 11 provides that "[a]ll documents submitted by the Requesting State shall be translated into the language of the Requested State, unless otherwise agreed." (Id., Art. 11).[22]

In this case, the official Request for Extradition from the Embassy of Romania came in diplomatic note numbers 1289 and 3355, dated May 21, 2012 and November 6, 2014, respectively. (Dkt. #1, Exh. 1 at 5-6; Benda Aff't ¶ 2). In her affidavit, Benda avers:

> [i]n accordance with Article 10 of the Extradition Treaty, documents that bear the certificate or seal of the Ministry or Department of Justice, or the Ministry or Department responsible for foreign affairs, of the Requesting State are admissible . . . . Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in Bucharest.

(Dkt. #1, Benda Aff't ¶ 6). In this case, the Romanian language documents transmitted along with the diplomatic note bear the seal of the Romanian Ministry of Justice (see Dkt. #1, Exhs.; Dkt. #61-1), as do the documents in Romania's supplemental submissions (see Dkt. #52, Exhs.), and as the Government correctly notes, there is no requirement that the translated documents also bear such certification.[23]

_____

[22]Although the extradition papers include some errors and inconsistencies, the only requirement for admissibility is that the documents are authenticated in the manner contemplated by Article 10 of the Treaty. See 18 U.S.C. § 3190; see also In re Ribaudo, No. 00 CRIM. MISC. 1 PG (KN), 2004 WL 213021, at *9 (S.D.N.Y. Feb. 3, 2004)(concluding that the inclusion of typographical or clerical errors is not dispositive of the outcome of the extradition proceeding); see Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir.)("authentication is the only requirement for admissibility of evidence under general United States extradition law")(citation omitted), cert. denied, 490 U.S. 1106, reh. denied, 492 U.S. 927 (1988).

[23]Manea relies on the opinion of Attorney Adrian Mitrea to contradict the evidence offered by Romania. (Dkt. #38, Exh. P). Attorney Mitrea states that the request for extradition and accompanying documents are missing the seal of the Ministry of Justice, and he opines that the

## D.  RELEVANT PROVISIONS OF THE EXTRADITION TREATY

### 1. ARTICLE 1: OBLIGATION TO EXTRADITE

Article 1 of the Treaty provides for the return of fugitives who have been "charged with, found guilty of, or convicted of an extraditable offense."  (See Dkt. #1, Extradition Treaty, Art. 1[24]).  Attached to the criminal complaint signed by this Magistrate Judge is the Romanian warrant of imprisonment penalty, dated March 5, 2001.  (Dkt. #1, Request for

---

warrant issued by the prosecutor violates both Romanian law and Article 5 European Court on Human Rights (id. at 10-11); there are contradictions in Romania's position, as Manea cannot be considered a fugitive (id. at 11); the court did not follow proper procedure before trying Manea in absentia, thus her sentence is "an absolute nullity, because of lack of notice in legal conditions . . ., concerning the right to a fair trial[]" (id. at 14); Manea was denied the right to a lawyer (id. at 14-15); Romania has violated the terms of the Treaty because it does not present the guarantees for a retrial (id. at 15-16); the sentence is not final as there was no opportunity for appeal (id. at 17-18); and the calculation of Romanian Lei is incorrect as the seven loans total $1.1 million dollars, not $12.6 million dollars  (id. at 24-25).

While "a fugitive may be permitted to offer explanatory testimony, [she] may not offer proof which contradicts that of the demanding country."  Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984), citing United States ex rel Petrushansky v. Marasco, 325 F.2d 562, 567 (2d Cir. 1963), cert. denied, 376 U.S. 952, reh. denied, 377 U.S. 920 (1964). As the Second Circuit has explained, "given the limited purpose of extradition hearings, fugitives do not benefit from many of the protections that are traditionally accorded to defendants in the criminal context."  Skaftouros, 667 F.3d at 155 n.16 (multiple citations omitted).  "Indeed, the fugitive's 'right to introduce evidence is . . . limited to testimony which explains rather than contradicts the demanding country's proof.'" Id., quoting Shapiro, 478 F.2d at 905. "[T]he . . . wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal."  Collins, 259 U.S. at 316, citing Charlton, 229 U.S. at 461.  The information Mitrea offers is not consistent with the position taken by Romania.  Thus, this Court's reliance thereon would be erroneous. Additionally, although Attorney Mitrea offers his legal opinions and legal conclusions, he does so without articulating the basis for his expertise, stating that such opinion was made under the "Expert of Consultation Services Contract . . . with" Manea's counsel. (Dkt. #38, Exh. P, at 4). The Second Circuit has also made clear "[t]he interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States . . . judge concerning the fairness of its laws and the manner in which they are enforced[]"; thus, taking testimony from expert and fact witnesses and considering "extensive reports, affidavits, and other documentation concerning [the Requesting State's] law enforcement procedures" is "improper[.]"  Ahmad v. Wigen, 910 F.2d 1063, 1067 (2d Cir. 1990)(citation omitted). Thus, to the extent that procedures were not followed in Romania, including denying Manea counsel and an appeal, such issues are matters to be addressed in Romania, and not by this Magistrate Judge.

[24]Plaintiff contends that Article 1 of the Extradition Treaty precludes Manea's extradition because she is not "charged" within the meaning of the Treaty.  See Section I.D.4.a. infra.

Extradition, Att. C at 60). The warrant orders "the arrest of" Manea for the "transfer to a penitentiary for the execution of" the penalty of "[nine] years imprisonment[.]" (Id.).

Plaintiff contends that Romania's failure to provide a copy of the 1997[25] arrest warrant renders her not properly "charged" under the Treaty (Dkt. #38, at 50-51); however, in the November 22, 2016 supplemental submission by Romanian authorities, it is explained that the May 12, 1997 arrest warrant was "validly issued in absentia of the defendant[]" and that "after the penal judgment" became final, the "judicial authorities issued the custodial sentence execution warrant No. 295/March 5th, 2001" on Manea. (Dkt. #52, Exh. 1 at 11). As stated above, the extradition request included the final 2001 warrant. Accordingly, even in the absence of the underlying 1997 arrest warrant, this Court properly relies on the representation of Romanian authorities that such warrant was valid, as required by the Treaty. See Bašić v. Steck, 819 F.3d 897, 901 (6th Cir.)(a 2011 document from the "Ministry of Justice of BiH Sarajevo" explains that the directive is "'the Arrest Warrant' in this matter"; the court "will not second guess this determination[]")(citation omitted), cert. denied, 137 S. Ct. 196 (2016).

### 2. ARTICLE 2: EXTRADITABLE OFFENSES

An "extraditable offense[,]" as defined in Article 2, is an offense that is "punishable under the laws of both Parties by" imprisonment of more than one year "or by a more severe penalty." (Dkt. #1, Extradition Treaty, Art. 2, ¶ 1). Article 2 further provides that an "extraditable offense" exists whether or not the two countries define the offenses the same, and whether or not the offense is one for which United States federal law would require a connection to interstate or foreign commerce. (Id., Art. 2, ¶¶ 3(a)-(b)). Thus, the offenses

---

[25]See note 14 supra.

for which Manea was convicted need not hold the same name, but rather "[i]t is enough if the particular act charged is criminal in both jurisdictions." Collins, 259 U.S. at 312. "In situations where the laws of both the requesting and the requested party appear to be directed to the same basic evil, the contrary rule is applicable." Shapiro, 478 F.2d at 908 (footnote omitted).

Romania seeks extradition of Manea after her conviction at trial in absentia in Romania for the following offenses under Romanian law: (1) deceit in a continued form; (2) knowingly making inaccurate accounting records; (3) forgery of documents under private signature; (4) using loans of a company for one's personal interest, in bad faith; and (5) use of forgery. (See Dkt. #1 & Exh. 1, Att. A). Specifically, under Article 215 of the Romanian Criminal Code, "[t]he act of deceiving a person, by presenting a false fact as being true or a true fact as being false, in order to obtain unjust material benefit for oneself or another, and if damage was caused," is a crime punishable by "imprisonment from [three] months to [two] years or by fine." (Dkt. #1, Exh. 1, Att. A at 9). "Deceit committed by using untruthful names or capacities, or with fraudulent means" is punishable by imprisonment of one to three years. (Id.). A person violates Law 82/1991, Article 40 by knowingly "making with knowledge inaccurate records as well as the action of omitting with knowledge the recording of the records into the accounting. . . ." (Id. at 10). Under Article 290, "forgery of a document under private signature . . . if the perpetrator uses the forged document or gives it to another person for use, in order to produce legal consequences [is] punishable by imprisonment from [three] months to [two] years or by fine[,]" and the use of forgery, under Article 291, is punishable by imprisonment from three months to three years if the document is an official document, or two years if the document is under private signature. (Id. at 9).

A party who, "with bad faith, use[s] the assets or loans/credits of the company contrary to the interests of it or for the personal benefit, or those who favo[]r another company, in which they are interested directly or indirectly shall be punished by imprisonment from [three] months to [two] years or by fine[,]" pursuant to Law 31/1990, Article 194(5). (Id. at 10).

Manea, relying on the report of her expert,[26] contends that Romania "completely revised its criminal code" but has not provided information about these new laws, so that Romania has not provided any information showing that the dual criminality requirement of Article 2 is met. (Dkt. #38, at 51-52). The U.S. State Department has certified that the offenses for which extradition is sought are covered by Article 2 of the Extradition Treaty (Dkt. #1, Exh. 1, Benda Decl. ¶ 5), and the State Department's determination is entitled to deference. See Factor v. Laubenheimer, 290 U.S. 276, 294-301 (1933). As the Government appropriately notes, the offenses, had they occurred in the United States, would be subject to prosecution under state laws: forgery, CONN. GENT. STAT. §§ 53a-138 (first degree), 53a-139 (second degree), 53a-140 (third degree); larceny (defined as part of embezzlement), CONN. GEN. STAT. §§ 53a-119 to -125b; bank fraud, 18 U.S.C. § 1344; and potentially wire fraud, 18, U.S.C. § 1343. See Hu Yau-Leung v. Soscia, 649 F.2d 914, 918-19 (2d Cir.), cert. denied, 454 U.S. 971 (1981)(court is permitted to look to both federal and state law to establish dual criminality).[27] Accordingly, the requirement for dual criminality has been satisfied.

---

[26]See note 23 supra.

[27]Pursuant to Article 522 of the Romanian Criminal Code, if extradited, Manea "may be re-tried by the court which tried at first instance, at the request of the convicted person." (Dkt. #1, Exh. 1, Att. A at 11).

## 3. ARTICLE 6: STATUTE OF LIMITATIONS

Manea next argues that Article 6 of the Extradition Treaty precludes Manea's extradition because the prosecution is time-barred.  (Dkt. #38, at 44-47; see Dkt. #1, Extradition Treaty, Art. 6).   The Government counters that Article 6[28] is "plainly discretionary[,]" and such discretion "is properly left to the Department of State." (Dkt. #52, at 11-12)(citation omitted).[29]

Article 6 of the Extradition Treaty provides that: "Extradition may be denied if prosecution of the offense of execution of the penalty is barred by lapse of time under the laws of the Requesting State." (Dkt. #1, Extradition Treaty, Art. 6).   Article 6 continues: "Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State." (Id.). The lapse of time provision in this Treaty, as in "[m]any bilateral  treaties, . . . preclude[s] extradition if prosecution for the offense charged, or enforcement of the penalty, has become barred by lapse of time under the applicable law."  See 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 476 (1987), Comment e.

This Court retains jurisdiction to examine Romanian law for the limited purpose of establishing whether its statute of limitations has expired, see Skaftouros, 667 F.3d at 161

_____

[28]The Government's reply brief contains a typographical error, referring to Article 7 instead of Article 6.  (Dkt. #52, at 11-12).  The underlying substantive discussion clearly refers to Article 6. (See id.).

[29]The treaty between the United States and Greece, at issue in Skaftouros, has mandatory language, rather than the use of the discretionary language – "may" – in the Treaty at hand.  See Skaftouros, 667 F.3d at 149 ("A fugitive criminal shall not be surrendered under the provisions hereof, when from lapse of time or other lawful cause, according to the laws of either of the surrendering or the demanding country, the criminal is exempt from prosecution or punishment for the offense for which the surrender is asked."), citing Treaty of Extradition Between the United States of America and the Hellenic Republic, U.S.-Greece, May 6, 1931, 47 Stat. 2185, Art. V.

("Because the Treaty itself requires an examination of whether the statute of limitations of either the demanding or asylum country has expired . . . , it was proper for the District Court to examine Greek law for the limited purpose of determining whether its statute of limitations had expired."), and the burden is on Manea to prove that the statute of limitations has run. Id.

The Romanian Criminal Code includes a special prescription period that Manea argues is applicable to this case. (See Dkt. #1, Exh. 1, Att. A at 12, Romanian Criminal Code Arts. 121-124; Dkt. #38, at 45).[30] There are three types of prescriptions applicable: the "prescription for criminal liability," the "special prescription," and the "prescription of penalty service." (Dkt. #1, Exh. 1, Att. A at 12-13, Arts. 122, 124, 126). The parties agree that the latest offense date is August 31, 1996. The prescription for criminal liability for Manea is, at most, eight years, based on Article 122(c) of the Romanian Criminal Code which provides that "when the law provides imprisonment for more than [five] years but not exceeding [ten] years, for the offen[s]e committed[,]" the prescription for criminal liability is eight years. (Id. at 12; see Dkt. #38, at 45; Dkt. #52, at 13). Thus, if, as the parties agree, the latest offense date is August 31, 1996, the prescription period would be complete on August 31, 2004. The criminal action against Manea was initiated on May 12, 1997 (see Dkt. #1, Exh. 1, Att. A at 16), well within the prescription period. Additionally, Romanian authorities have stated that "in this procedural stage (of final penal judgment enforcement) the prescription

---

[30]Manea's expert, Attorney Tiberiu Dianu, confirms that the prescription terms "have remained relatively unchanged[]" in the Romanian New Criminal Code, which was adopted in 2009, and has been in force since February 1, 2014. (Dkt. #38, Exh. Q ¶ 14). He adds that under the new law, the special prescription period for Manea's case is sixteen years and Romania has a "most favorable law principle" which would "serve to bar [] Manea's extradition[]" (Dkt. #60 at 23; id., Exh. S ¶ 19); the new language of "one more time" versus "one more half" changes the period from twelve years (eight years plus four years) to sixteen years (eight years plus eight years). (Dkt. #60, Exh. S ¶¶ 14, 18).

of penal responsibility can no longer be brought up[.]" (Dkt. #52, Exh. 1 at 11).

The special prescription period for criminal liability, as provided for in the Romanian Criminal Code, Article 124, "removes criminal liability regardless of how many interruptions may occur, if the term in [Article] 122 is exceeded by one more half." (Dkt. #1, Exh. 1, Att. A, at 12). Thus, because the term in Article 122, as referenced above, is eight years, the special prescription period which would remove criminal liability would be eight years plus four more years, or twelve years. Twelve years from the last offense date is August 31, 2008. Manea's expert, Attorney Tiberui Dianu, contends that this prescription period applies to the date that the extradition request was filed, and the extradition request was not filed until 2012. (Dkt. #38, Exh. Q ¶ 10 ("prescription of criminal liability has been accomplished on August 31st, 2004, while the extradition request was issued much later, on April 23rd, 2012.")).

Attorney Dianu explains that the "special prescription (Article 124) has been to establish a clear and final prescription term against a continuity of procedural acts that would otherwise have created a de facto imprescriptibility of offense, in contradiction with the general principles of prescription evoked by Articles 122, 124, and 126." (Dkt. #38, Exh. Q ¶ 18). He then concludes that "the charges against the defendant are prescribed and the claims of the Romanian authorities to extradite the defendant are barred by the statute of limitation imposed by the Romanian legislation[.] . . ." (Id., Exh. Q ¶ 19). Attorney Dianu's conclusion, however, contradicts Romania's explanation of the law, which is that "[t]he relevant action is the filing of criminal charges, and not the filing of the extradition request." (Dkt. #52, at 13);[31] Messina, 728 F.2d at 80 (explanatory testimony is permissible but a

_____

[31]Romania's interpretation of its own law is consistent with the Restatement (Third) of Foreign Relations Law: "For purposes of applying statutes of limitation to requests for extradition . .

21

fugitive "may not offer proof which contradicts that of the demanding country")(citation omitted); see also Shapiro, 478 F.2d at 905 (citations omitted)(the fugitive's "right to introduce evidence is . . . limited to testimony which explains rather than contradicts the demanding country's proof[]").[32]

Romania represents that for the prescription of penalty service, according to Article 126, Paragraph 1, Index B, Penal Code, the limitation period for the execution of punishment is fourteen years; the date the judgment became final was March 5, 2001 (Dkt. #52, Exh. 1 at 11); therefore, as Manea's expert agrees, the limitation period would end on March 5, 2015. (Dkt. #38, Exh. Q ¶ 9). However, Romania explains that the prescription of penalty service is tolled in this case because of the submission of the extradition package in the spring of 2012. (Dkt. #52, Exh. 1 at 11-12; see Dkt. #1, Extradition Treaty, Art. 6 ("Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State.")). On March 1, 2012, the Romanian authorities learned that Manea was in the United States. (Dkt. #52, Exh. 1 at 11). On March 2, 2012, "a decision was issued . . . by which [Romania] acknowledged as fulfilled the legal requirements for the extradition of the sentenced person[.]" (Id.)(emphasis omitted). According to the Romanian authorities,

> the limitation period for sentence execution did not expire on March 4th, 2015 as the course of sentence execution prescription was interrupted, considering that on March 2nd, 2012[,] the decision was passed by which the judicial

---

., the period is generally calculated from the time of the alleged commission of the offense to the time of the warrant, arrest, indictment, or similar step in the requesting state, or the filing of the request for extradition, whichever occurs first." See 1 Restatement (Third) of the Foreign Relations Law of the United States § 476 (1987), Comment e. Moreover, "[t]he period may be tolled if the accused has fled from the requesting state or concealed his [or her] whereabouts." Id.

[32]See note 23 supra.

> authorities acknowledged as fulfilled the requirements for the extradition of
> the sentenced person . . . [and] transmitted to the Ministry of Justice who,
> on April 23rd, 2013[,] submitted the extradition requests to the General
> Directorate – Consular Affairs of the Ministry of Foreign Affairs so that it
> should be transmitted by diplomatic channels to the U.S. authorities.

(Dkt. #52, Exh. 1 at 11-12).

Romanian officials have detailed the tolling process as it applies to this case, and this Court cannot "question the reliability or trustworthiness of a judicial decree from a foreign nation." In re Extradition of Jimenez, No. 14-2319-SAG, 2014 WL 7239941, at *1-2 (D. Md. Dec. 16, 2014)(rejecting claim that extradition to Costa Rica was not permitted because the statute of limitations lapsed for sentencing when the documents provided by Costa Rica explained that the statute of limitations was tolled), citing Jhirad, 536 F.2d at 484-85 ("It is not the business of our courts to assume the responsibility for supervising the integrity of the integrity of the judicial system of another nation."); Skaftouros, 667 F.3d at 156 ("Any arguments regarding the demanding country's compliance with its own laws [ ] are properly reserved for the courts of that country."); see also In re Extradition of Robertson, No. 11-MJ-0310 KJN, 2012 WL 5199152, at *10-11 (E.D. Cal. Oct. 19, 2012)(finding for extradition despite "arguable points raised by counsel" as the court "decline[d] to make a determination regarding the law of Canada, with respect to what forms of supervision are included in a criminal sentence under the laws of that country that is at odds with the representations of the government requesting extradition[]"), citing Skaftourous, 667 F.3d at 156.

Moreover, in addition to concluding that the treaty provision addressing the statute of limitations does not bar extradition in this case, this Court is also mindful that the "delay in seeking extradition may be relevant to the Secretary of State's final determination as to whether a fugitive should be extradited," but delay is not an independent defense to judicial

extradition proceedings.  <u>Murphy v. United States</u>, 199 F.3d 599, 602 (2d Cir. 1999), <u>citing</u> <u>Kamrin v. United States</u>, 725 F.2d 1225, 1227 (9th Cir.), <u>cert. denied</u>, 469 U.S. 817 (1984).[33]

Thus, although the Court agrees with Manea that "[t]he existence of a statute of limitations in the governing treaty is an important protection, particularly in a case like this where it has been [more than twenty] years since the end of the alleged offense conduct . . .", especially where the relator was convicted in absence and without counsel, where the key co-defendant is dead, where the witnesses are dead, and where the victim banks are defunct (Dkt. #38, at 44), the latter consideration of Manea's laches argument regarding the lapse of time is not an argument for this Court, but rather, one properly for the Executive branch's consideration. <u>See In re Ribaudo</u>, 2004 WL 213021, at *10-11 (absent Second Circuit authority for the proposition that a delay to extradition or the doctrine of laches applies, the fourteen years that elapsed between the date the arrest warrant was issued in Italy and the date upon which the extradition request was made does not constitute a defense to extradition).

### 4. SUFFICIENCY OF THE EVIDENCE

#### a. ARTICLE 8: EXTRADITION PROCEDURE & REQUIRED DOCUMENTS

Pursuant to Article 8 of the Treaty, requests for extradition "shall be submitted through the diplomatic channel" and shall be supported by "documents, statements, or other types of information that describe the identity and probable location" of the fugitive; "information describing the facts of the offense and a brief procedural history of the case"; the "relevant text of the law(s) describing the essential elements of the offense"; the "relevant text of the law(s) prescribing punishment for the offense"; and "the relevant text

---

[33]In both the <u>Murphy</u> and <u>Kamrin</u> cases, the applicable treaties did not include a specific treaty provision concerning the statute of limitations.  <u>See Murphy</u>, 199 F.3d at 602; <u>see Kamrin</u>, 725 F.2d at 1227.

of the law(s) describing any time limit on the prosecution of enforcement of the penalty[.]" (Dkt. #1, Extradition Treaty, Art. 8 ¶¶ 2(a)-(e)).

In this case, Manea contends that Romania has not provided "certain portions of the Romanian Criminal Code[,]" namely Articles 33 and 34.[34]  (Dkt. #38, at 48-49).  However, the Romanian authorities provided a supplemental submission, dated November 22, 2016, transmitted to the United States Attorney's Office for the District of Connecticut on January 3, 2017 (Dkt. #52, at 3 & Exh. 1), in which the relevant text of Articles 33 and 34 were included.[35]  (See Dkt. #1, Extradition Treaty, Art. 8 ¶¶ 2(b)- (c) (Romania need only provide the "relevant text" of the laws describing the elements of the offense and the punishment)). Pursuant to Articles 9 and 10 of the Treaty, supplemental information in support of extradition was provided by the Ministry of Justice of Romania to the United States Department of Justice, and such supplemental information is admissible as it bears the certificate or seal of the Ministry.  (Dkt. #1, Extradition Treaty, Arts. 9-10).[36]

---

[34]Manea also contends that Romania did not provide Article 292 (Dkt. #38, at 48-49), however, Manea was pardoned of that offense.  (See Dkt. #1, Exh. 1, Att. C at 60 ("art. 292 Cp with 41(2) Cp  2 years pardoned Law 137/97)).

[35]Article 33 defines "multiple offenses" and Article 34 defines the penalty for "multiple offenses[.]"  (Dkt. #52, Exh. 1 at 12).  The original version of this submission, in Romanian, bears the seal of the Ministry of Justice.

[36]Manea also contends that the forensic accountant's report, along with the statements of Manea and the witnesses have not been authenticated as required by both 18 U.S.C.  § 3190 and Article 10 of the Treaty.  (Dkt. #60, at 6).  18 U.S.C. § 3190 requires that "the principal diplomatic or consular officer of the United States resident in such foreign country" certify as to the document's authenticity. As discussed above, Article 10 of the Extradition Treaty provides that "[d]ocuments that bear the certificate or seal of the Ministry or Department of Justice, or the Ministry or Department responsible for foreign affairs of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization." (Dkt. #1, Extradition Treaty, Art. 10).  The Ministry of Justice forwarded the Forensic Accountant's Report and the statements of eight witnesses, as well as a statement of Manea, dated October 9, 1995; while the translated documents do not bear a certificate or seal, the Romanian language versions do.  (See Dkt. #52, Exhs). As discussed above, there is no requirement that the translated documents also bear such certification.

Additionally, pursuant to the terms of the Treaty, a request for extradition shall also be supported by: "(a) a copy of the warrant or order of arrest or detention issued by a judge, court, or other competent authority; [and] (b) a copy of the charging document; and (c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought. " (Dkt. #1, Extradition Treaty, Art. 8 ¶¶ 3(a)-(c)). For a request for extradition relating to a person who has been found guilty or convicted in absentia, such as the case at hand, the requirement for the production of the documents referenced in Section 3 of Article 8 is mandatory. (Id., ¶ 4(d)). Additionally, Article 8 requires that a request for a person who has been found guilty or convicted of the offense for which extradition is sought must be supported by "a copy of the conviction and sentence," and "information establishing that the person sought is the person to whom the finding of guilt refers[.]" (Id. ¶¶ 4(a)-(b)). Thus, this Extradition Treaty requires that the foregoing evidence to support a probable cause finding in this case. See Haxhiaj v. Hackman, 528 F.3d 282, 288 (4th Cir. 2008), citing M. Cherif Bassiouni, INTERNATIONAL EXTRADITION: UNITED STATES LAW AND PRACTICE 877 (5th ed. 2007)(the finding of probable cause is required by statute, 18 U.S.C. § 3184 and is also included in United States treaties).

The materials submitted by Romania in support of its request for extradition include:[37] (a) a summary report of the history of the case; (b) a certified copy of judgment of conviction and sentence; (c) a certified copy of the judgment of imprisonment; (d) a copy of Manea's criminal history; (e) a copy of the opinion from the Bucharest Court, Criminal Sentence No. 150, Public Session dated February 1, 2001; (f) a forensic accountant's report; (g) statements from eight witnesses, and a written statement attributed to Manea; and (h)

---

[37]See Section I.C. supra.

a copy of the Romanian indictment.[38] (Dkt. #1, Exh. 1, Atts. A-D; Dkt. #38, at 38-39; Dkt. #52, Exhs. 1-5; Dkt. #60, at 6; Dkt. #61).   Manea contends that the absence of the arrest warrant and information that would provide a reasonable basis to believe that Manea committed the offense for which extradition is sought is grounds for Romania's extradition request to be denied.  (Dkt. #38, at 38-39; Dkt. #60, at 6).

As discussed above, see Section I.D.1. supra, Romania provided the warrant of imprisonment penalty dated March 5, 2001 as an attachment to the original extradition request (see Dkt. #1, Exh. 1, Att. C at 60), and Romania has confirmed that the 2001 warrant is valid.   Additionally, the Treaty requires submission of "a copy of the warrant or order of arrest or detention" (see Dkt. #1, Extradition Treaty, Art. 8 ¶ 3(a)(emphasis added)), thus Romania is not required to produce the initial detention order under the Treaty.

On February 24, 2017, the Government filed both the Romanian and English versions of the indictment, and on September 11, 2014, Romania submitted both the Romanian language version of the indictment and an English translation to the United States Department of Justice.  (Dkt. #61).[39]  The English version of this document was provided to defense counsel in discovery on August 14, 2015. (Id.). At issue therefore, is whether the remaining documents, including the court opinion, the forensic accountant's report, and the

---

[38]As discussed above, in accordance with Article 10 of the Extradition Treaty, the documents that bear the certificate or seal of the Ministry or Department of Justice, or the Ministry or Department responsible for foreign affairs of the Requesting State are admissible in extradition proceedings without further certification, authentication, or other legalization (Dkt. #1, Extradition Treaty, Art. 10).  The indictment bears such seal, thus satisfying the authentication requirement. (See Dkt. #61-1).

[39]Prior to the Government's submission of the indictment, Manea claimed that Romania's failure to submit the charging documents with its extradition request in this case is "fatal." (Dkt. #60, at 17)(footnote omitted).

statements from eight witnesses, and from Manea  provide a reasonable basis to believe that Manea committed the offense for which extradition is sought.

### b. PROBABLE CAUSE

"To support an extradition request, the prosecution need only meet the relatively modest burden of demonstrating probable cause." In the Matter of the Extradition of Jahmel Glen Blakeney, No. 10-NJ-635(SMG), 2010 WL 4457778, at *4 (E.D.N.Y. Nov. 1, 2010). "[I]n making a probable cause determination, a judicial officer should consider the 'totality of the circumstances' and 'make a practical, common-sense decision' whether the evidence is sufficient to sustain a finding of probable cause." In re Ribaudo, 2004 WL 213021, at *5, quoting Illinois v. Gates, 462 U.S. 213, 238-40, reh. denied, 463 U.S. 1237 (1983).[40] "Furthermore, '[s]ufficient information must be presented to the magistrate [judge] to allow that official to determine probable cause; his [or her] action cannot be a mere ratification of the bare conclusions of others.'" Id., quoting Gates, 462 U.S. at 239.

Romania "is not required to present its entire case in this country[,]" but rather, "[t]he evidence presented need only 'support a reasonable belief that [Manea] was guilty of the crime[s] charged." Austin v. Healey, 5 F.3d 598, 605 (2d Cir. 1993), cert. denied, 510 U.S. 1165 (1994)(citations & internal quotations omitted).  Because the Federal Rules of Evidence do not apply to extradition hearings, FED. R. EVID. 1101(d)(3), "hearsay and other evidence that would be inadmissible at a trial may be considered in determining probable cause." In the Matter of Extradition of Ernst, No. 97 CRIM. MISC 1 PG 22, 1998 WL 395267,

---

[40]Manea relies on statement of a Romanian attorney, Adrian Mitrea, who concludes that in the case of in absentia conviction, this Court must make an independent determination of probable cause based upon evidence, which provides a reasonable basis to believe that the person sought committed the offense for which extradition is requested. (Dkt. #38, at 37-39 & Exh. P, at 27; see note 23 supra).

at *9 (S.D.N.Y. July 14, 1998), citing Collins, 259 U.S. at 37(additional citation omitted). "An affidavit must provide the magistrate [judge] with a substantial basis for determining the existence of probable cause," and "wholly conclusory statement[s]" will not suffice. Gates, 462 U.S. at 239.[41]

In this case, Manea contends that Article 8 of the Extradition Treaty, see Section I.D.4(a) supra, explicitly requires separate evidence supporting probable cause when a defendant has been tried in absentia, and thus under the terms of the Treaty, Romania must provide evidence of "something other than the charging document, arrest warrant, and conviction and sentencing documents." (Dkt. #38, at 38). The Court agrees that more than conclusory evidence is required; however, the evidence submitted by Romania suffices.

In the indictment, dated December 23, 1997, Manea, along with suspects Ciocan Marian and Zega Macedon Anton, were alleged to have committed "fraud against private assets, material forgery in official documents, intellectual forgery, use of forgery, forgery in statements, abuse of office against the interest of persons and the use of the credit of the company for personal benefit[.]" (Dkt. #61-1, at 41).[42] The indictment was based on statements of the defendants (see id. at 47, 53, 56, 62, 65, 68), founding and functioning documents of Manea's two companies: SC Ando Exim SRL and SC Bravo MM'95 SRL (id. at 42, 47, 50, 53); loan files (see, e.g., id. at 44, 46-47, 50, 53, 55, 61, 63), trial balances issued by Manea (see id. at 47, 55); expert reports (see id. at 47); payment orders (see id.

_____

[41]Additionally, the determination of witness credibility and the weight assigned to their testimony "is solely within the province of the extraditing magistrate." Austin, 5 F.3d at 605 (citation & internal quotations omitted).

[42]As discussed above, on September 11, 2014, Romania submitted both the Romanian language version and an English translation of the Romanian indictment, dated December 23, 1997, to the United States Department of Justice. (See Dkt. #61); see note 10 supra. The Court will refer to the certified English translation. (Dkt. #61-1, at 41-74).

at 45, 47, 55); accounting notes (see id. at 47, 53); purchase invoices for vehicles (see id. at 48); purchase contracts for a farm located in Ciorogarla Commune (see id. at 51-52), four large Volvo road trains (see id. at 48, 50, 61), and a mini hotel located in Busteni (see id. at 56-57, 62); copies of guarantee contracts of real estate and mobile assets (see id. at 53-54, 58, 64, 67); balance sheets and other accounting documents (see id. at 53-54, 60-61); and witness statements (id. at 42-45, 51, 53, 56, 62, 65, 67-68).  A trial was held before Bucharest Court, during which Ciocan Marian and Zega Macedon Anton were represented (see Dkt. #1, Att. B at 19), and the Bucharest Court heard testimony from, among others, the twelve witnesses referenced in the indictment.  (Dkt. #1, Att. B at 26).[43] In its thirty-six page decision, in addition to referencing witness testimony, the Bucharest Court referred to documents upon which it relied in reaching its conclusion: pages of the criminal prosecution file, the case file, and the documents attached thereto, and an expert report which shows "under which circumstances Bancorex granted loans and facilitated the economic agents, what was the procedure of approval of the loans, if there were any payments made before the signing of the loan contracts and if there is any connection between the method in which the loans were granted by Bancorex–Lipscani Branch and the fact that they were not returned[.]" (Id. at 25-26).[44]

_____

[43]In the decision, the Bucharest Court lists the witnesses mentioned in the indictment, from whom the court heard testimony; additionally, the court detailed information from named witnesses who were not referenced in the indictment. (Id.).

[44]The forensic accountant's report provided to the 3rd District Court in Bucharest on January 25, 2001 addresses the three loans for which Manea was accused of taking for personal purposes. (Dkt. #52, Exh. 3).  The objectives of the report were to: (1) determine the conditions under which SC Bancorex SA – Lipscani Branch grants loans or other facilities to economic agents; (2) determine the procedure used in granting the loans, the "legal circuit of the documents if such circuit was observed"; and, if the "legal circuit was not observed, to identify the responsible persons[]"; (3) determine if payments were made before the loan agreements were signed and if such procedure was allowed and to identify the responsible persons; and (4) determine "if there is causality between the manner in which the loans were granted by Bancorex SA – Lipscani Branch

Romania has produced eight witness statements. (Dkt. #52, Exh. 3 at 16-32).[45] Five of these witnesses are referenced in the indictment (specifically, Dudu Anisoara, Dragnea Corneliu, Oana Camelia, Tudor Carmen Lucretia, Tita Lucia), and all twelve of the witnesses referenced in the indictment testified before the Bucharest court. (See Dkt. #1, Exh. 1, Att. B at 26 ( the "Court . . heard from the [twelve] witnesses mentioned in the Indictment: Nutulescu Mariana, Nicolae Camelia, Nicolae Constantin, Dragnea Corneliu, Oana Camelia, Dudu Anisoara, Stanescu Elena, Firca Miheala Goje Samoil, Maier Adrian, Ionete Angela, Tudor Carmen Lucretia and Tita Lucia Mariana")). An additional individual whose witness statement is before this Court also testified before the Bucharest Court. (See id. at 27 (Capetti Ana)). As stated in its decision, the Bucharest Court's decision is based on " the material gathered in the file," witness testimony and the expert report, and documentary facts and evidence gathered during the prosecution, as recited below. (Id. at 26).

---

and the fact that such loans were not repaid." (Id.). As stated above, these objectives were also recited in the February 2001 Bucharest Court decision (see Dkt. #1, Att. B at 26); the forensic accountant's report, however, does not implicate Manea.

[45]The statements from Andronic Iuliana Margareta Claudia and Capetti Ana were given during the prosecution stage, and the statements from Tita Lucia, Stanescu Elena, Oana Camelia, Tudor Carmen Lucretia, Dragnea Corneliu, and Dudu Anisoara were given before the court, during trial proceedings. (Dkt. #52, Exh. 3, at 2). As discussed above, "[n]either the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings." Skaftouros, 667 F.3d at 155 n.16, citing FED. R. CRIM. P. 54(b)(5); FED. R. EVID. 1101(d)(3). Thus, while "[h]earsay is admissible[]" id., citing United States ex rel Klein v. Mulligan, 50 F.2d 687, 688 (2d Cir.), cert. denied, 284 U.S. 665 (1931), and "unsworn statements of absent witnesses may be considered[,]" id., citing Collins, 259 U.S. at 317, the statements, standing alone, do not "support a reasonable belief that [Manea] was guilty of the crime[s] charged." Austin, 5 F.3d at 605 (citations & internal quotations omitted). That said, contrary to Manea's contention, the Romanian language versions of these documents are properly authenticated as required under Article 10 of the Treaty, and the decision of the Bucharest Court is authenticated, as is the summary of the case, and such evidence, as discussed further below, supports a finding of probable cause.

<u>i. FINDINGS OF THE BUCHAREST COURT</u>

SC Ando Exim SRL and SC Bravo MM'95 SRL Initial Loans[46]

On or about October 3, 1994, the administrator of a company named SC Ando Exim SRL Bucharest transferred all of her interest in the company to Manea, who promised the administrator that she (Manea) would register the company in person with the Office of Registry of Commerce. (Dkt. #1, Exh. 1, Att. B at 26-27).[47] The court found, "according to the assignment contract" itself, the assignment contract was filed with the Office of the Registry of Commerce, but Manea did not register the company as promised. (<u>Id.</u>).

On October 18, 1994, Manea went to Bancorex SA – Lipscani Branch and applied to open bank accounts in the Romanian currency (lei) and "other currency." (<u>Id.</u> at 27). At the bank, she met the director of the branch, Capetti Ana. (<u>Id.</u>). Consistent with the witness statement provided by Capetti Ana, the Court found that Manea told Capetti Ana that she (Manea) is a friend of a director at another bank and that her father was the director of Pepsi Cola Company in Bucharest. (<u>Id.</u>; <u>see</u> Dkt. #52, Exh. 3 at 20-21).[48] Manea told Capetti Ana

---

[46]SRL is an abbreviation for Societe cu răsplendere limitată, the equivalent of a limited liability company in the U.S. <u>S.R.L.</u>, WIKIPEDIA (last visited Feb. 25, 2018).

[47]Consistent with this finding is the statement of Andronic Iuliana Margareta Claudia, taken on April 4, 1997, in which she stated that she sold her company, SC Ando Exim SRL to Manea for $1.00. (Dkt. #52, Exh. 3, at 17). She also stated that she "considered that the two documents, which were notarized, [were] sufficient proof of the sale and [she] did not know, at that time that, according to the law, a proof of recorded amendments issued by the Trade Register was necessary." (<u>Id.</u> at 18). She knew that Manea "wanted to buy some equipment for production[,]" but it was not until she was contacted by the police on January 30, 1997, that she learned that Manea had taken a loan from Bancorex on behalf of Ando Exim SRL for 900 million lei. (<u>Id.</u> at 18-19).

[48]The witness statement of Capetti Ana contains inconsistencies as she states that she "never met Manea Ortansa Mirela[]" but also stated that "[o]n that meeting, Mrs. Manea Ortansa Mirela told me" about her father and that she would not have registered for the loan if Mr. Ghiba Alexandru, the vice-president of the bank branch, had not promised her additional financing. (Dkt. #52, Exh. 3, at 21).

that she would perform important commercial activities through Bancorex SA and that she could facilitate a business relationship between Bancorex SA and Pepsi Cola. (Dkt. #1, Att. B, at 27).

Capetti Ana then introduced Manea to the head of the bank's commercial client department, Manea's co-defendant Zega Macedon Zega Macedon Anton. (Id. at 27). Capetti Ana relayed to Zega Macedon Anton what Manea had said and asked Zega Macedon Anton to give Manea special attention. (Id.). Zega Macedon Anton in turn introduced Manea to the account administrator, Tita Lucia Mariana, who was a witness at trial, and whose witness statement is before this Court.[49] (Id.). Zega Macedon Anton instructed Tita Lucia Mariana to open the accounts as Manea requested. (Id.). Tita Lucia Mariana testified that she informed Zega Macedon Anton that SC Ando Exim SRL Bucharest had not been registered with the Office of Registry of Commerce; Zega Macedon Anton told Tita Lucia Mariana to open the accounts anyway because Manea could provide proof of the company registration later. (Id.). On October 18, 1994, accounts were opened for SC Ando Exim SRL at Bancorex SA in Romanian lei, dollars, and British pounds. (Id.).

On February 3, 1995, Manea sought a loan on behalf of SC Ando Exim SRL from Bancorex SA – Lipscani Branch in the amount of 700 million lei for a period of six months. (Id.). The court, referencing the loan application, found that Manea claimed she would use the money to purchase pastry equipment and utility equipment for the company to facilitate its expansion, and that in an attached trial balance of SC Ando Exim SRL, dated January 31, 1995, signed by her, she represented that the trial balance stated that the "company was

---

[49]Tita Lucia Mariana stated that the "procedure was followed for all three loans[,]" and Tita Lucia Mariana was asked to evaluate the securities prior to approval, but she "received no answer." (Dkt. #52. Exh. 3, at 28-30).

performing large and profitable commercial activities[,] when in reality the company had no concrete activity." (Id.)

Manea submitted the request for this 700 million lei loan directly to her codefendant Zega Macedon Anton, who was deputy director of the branch. (Id.). He forwarded the application for analysis and suggestions to the Head of Commercial Customer Service, Tudor Carmen Laurentia, who testified at trial, and whose statement is before this Court.[50] (Id. at 27-28). Zega Macedon Anton directed that until the loan was approved, Manea was to be given a 300 million advance, asking the account administrator, Tita Lucia Mariana, to prepare the paperwork for the advance payment. (Id. at 28). Tita Lucia Mariana testified that she told Zega Macedon Anton that such an advance would be illegal, but Zega Macedon Anton insisted that the advance go forward and was authorized by the branch director, Capetti Ana. (Id.). At Zega Macedon Anton's insistence, Tita Lucia Mariana prepared payment order number 309327, through which the bank paid Manea a 300 million lei advance on the loan. (Id.).

On February 16, 1995, Manea signed and submitted a second loan application to Bancorex SA on behalf of SC Ando Exim SRL, requesting the remaining 400 million lei that were outstanding based on her February 3, 1995 loan request. (Id.). In the application, Manea discussed that certain buildings would be pledged as collateral for the loan and

---

[50]While the translation of the Bucharest Court's decision refers to this witness as Tudor Carmen Laurentia, in her statement, her name appears as Tudor Carmen Lucretia; in Tudor Carmen Lucretia's statement, she wrote that SC Ando Exim SRL and SC Bravo's company documents were not in order, and the banks procedure was not followed. (Dkt. #52, Exh. 3, at 24). She also stated that "the information presented for the loan agreement, [and] the accounting documents were not endorsed by the fiscal authorities, so there was no certainty as to the accuracy of those documents[]"; and "the money was cashed in before the loan agreement was concluded[]"; "[t]he recommendations referred exclusively to defendant Manea Ortansa and to the fact that her father was the manager of SC Pepsi Cola." (Id. at 24-25).

discussed mortgages and insurance policies for the buildings, and Manea said that she would provide the 1994 balance sheet for SC Ando Exim SRL within forty-eight hours. (Id.). Upon receipt of the application, Zega Macedon Anton ordered that the 400 million lei be disbursed to Manea. (Id.). He wrote on the application: "Yes. Loan application is in process of being approved. The documents for the payments shall be presented [to the bank]." (Id.). Based on Zega Macedon Anton's order, Manea received 400 million lei in cash that day, and Manea never provided the bank with the promised 1994 balance sheet, which would have shown that the company did not have any activity during 1994. (Id.).

On March 13, 1995, Manea signed and submitted another loan application to Bancorex SA, seeking an increase in the original 700 million lei loan amount by an additional 200 million lei, stating that the additional amount was necessary to cover the value of pastry equipment bought by the company. (Id.). Manea supported the application with "a purchase invoice for some equipment from 'Duplicam' that contained forged data because [SC Ando Exim SRL]" was not actually doing any business. (Id.). The loan application also requested a cash payment of 300 million lei, even though it sought only an additional 200 million lei. (Id.). The same day, after approval by Zega Macedon Anton, Bancorex SA paid Manea 200 million lei in cash, pursuant to Account Note 309694. (Id.).[51]

After the 900 million lei was disbursed to Manea, Loan Convention number 10445 was signed. (Id. at 29). Manea signed in the column for the "borrower" and Zega Macedon Anton and Capetti Ana signed in the column for "Bancorex SA." (Id.). The loan was guaranteed with a building owned by Manea, a plot of land owned by Manea's co-defendant Ciocan

_____

[51]The decision states that 20 million lei were paid, "representing several payments." (Id. at 28). The next sentence, however, references the full payment of 900 million lei, which would mean that the additional 200 million lei was paid to Manea. (Id. at 28-29).

Marian and his wife, and another building owned by a third party. (Id.).  According to the court's decision, the loan was not registered in the company accounts and was instead used for personal benefit by Manea, including to pay a third party 150 million lei to repay a debt. (Id.).[52]

SC Bravo MM'95 SRL

In February 1995, Manea purchased a plot of land with a house foundation in Voluntari Commune for $27,000 U.S. dollars. (Id.). On or about February 6 and 7, 1995, the administrator of a company named SC Gentry Coimpex SRL, who owned seventy percent of the company, assigned his interest to Manea, and the remaining thirty percent was assigned by another administrator of the company to Manea's codefendant Ciocan Marian. (Id. at 26). Manea and Ciocan Marian changed the name of the company to SC Bravo MM'95 SRL, and Manea registered the new company name with the Office of Registry of Commerce. (Id.).

On March 1, 1995, Manea opened three accounts at Bancorex SA in Romanian lei, dollars, and pounds for SC Bravo MM'95 SRL. (Id. at 27).  On March 16, 1995, Manea's co-defendant Ciocan Marian traveled with a witness, Nicolae Constantin, to Germany where Ciocan Marian opened a personal bank account (No. 10208824) in his own name at Kreisspa Kasse Bank in Nordhon, Germany. (Id. at 29).

On March 24, 1995, Manea signed and submitted to Bancorex SA, Lipscani Branch, a loan application on behalf of SC Bravo MM'95 SRL, requesting approval of a loan in the amount of 400,000 Deutsche Marks for the purchase of trucks that she said were "necessary to start the import – export operations that her company was undertaking in the food

_____

[52]As stated above, the court relied on the evidence underlying the indictment (see Dkt. #1, Att. B, at 24), including functioning documents of Manea's two companies: SC Ando Exim SRL and SC Bravo MM'95 SRL. (Dkt. #61-1, at 42, 47, 50, 53).

industry." (Id.). She attached to the loan application a pro forma invoice issued in both German and English, that purported to be from Volvo, showing that four transport road trains were sold to SC Bravo MM'95 SRL for 584,000 Deutsche Marks. (Id.). Manea asked for the loan amount to be directed to account number 10208824 at Kreisspa Kasse Bank, which was the account in the name of her co-defendant Ciocan Marian. (Id.).

On March 27, 1995, Ciocan Marian transmitted to Manea a document written in English in which he requested Bancorex SA to pay the value of the Volvo road trains to the account belonging to him at Kreisspa Kasse Bank. (Id. at 29-30). Manea provided this document to Bancorex SA. (Id. at 29).

On the basis of the documents discussed in the preceding two paragraphs, the account administrator at Bancorex SA drafted a note proposing approval of the loan Manea had requested on March 24, 1995. (Id. at 30). The "note was approved by the Head of Commercial Customer Service and afterwards by the Risk Committee." (Id.). The collateral that Manea pledged to guarantee this loan consisted of two plots of land in Voluntari Commune and the Volvo road trains, which were to be pledged after the import operation was complete. (Id.).

On March 29, 1995, Manea drafted a request for payment of 312,000 Deutsche Marks from the loan account of SC Bravo MM'95 SRL to Ciocan Marian's account number 10208824 at Kreisspa Kasse Bank in Germany, stating falsely that the latter account belonged to Volvo. (Id.). She claimed that the 312,000 Deutsche Marks represented partial payment on the invoice from Volvo dated March 21, 1995, and that she would present the custom documents for the Volvo road trains within forty-five days. (Id.).

On March 30, 1995, Bancorex SA authorized and signed a loan for 400,000 Deutsche

Marks for SC Bravo MM'95 SRL for the purchase of four Volvo road trains from Germany. (<u>Id.</u>). The loan was due to be repaid on December 31, 1995, and of that amount, 312,000 Deutsche Marks were transferred to account number 10208824 at Kreisspa Kasse Bank, the account in the name of Ciocan Marian. (<u>Id.</u>).  The bank also issued Manea, at her request, a number of American Express traveler's checks, worth 47,000 Deutsche Marks, and 35,000 Deutsche Marks in cash for the "voyage to Germany." (<u>Id.</u>).

Manea told Ciocan Marian that Deutsche Marks had been transferred to his account at Kreisspa Kasse Bank and he named Manea as a co-signor on that account. (<u>Id.</u>). Manea then told Ciocan Marian that the purchase of the Volvo road trains had been cancelled and the two agreed to buy vehicles for their own personal use costing 250,000 Deutsche Marks. (<u>Id.</u>). The pair bought a 1994 white Mercedes Benz that was later registered in Manea's name, a 1982 black Mercedes Benz that was later registered to Ciocan Marian, and a 1992 Volkswagen Transporter later registered to Ciocan Marian. (<u>Id.</u>). The remaining 150,000 Deutsche Marks that had been transferred into the account by Bancorex SA remained in the account. (<u>Id.</u>).

On May 2, 1996, Manea signed and submitted to Bancorex SA a letter stating that, on May 3, 1996, she would provide the bank with a document demonstrating that a Volvo branch in Austria had paid to a Volvo branch in Sweden the value of four road trains. (<u>Id.</u>). Manea also presented to the bank several brochures concerning the road trains to document the pledge of those trains as collateral for the loan. (<u>Id.</u>). Manea informed the bank, however, that the road train had been stolen, so she would not be able to pledge them as collateral. (<u>Id.</u> at 30-31). Manea did not provide any proof of the vehicles' theft. (<u>Id.</u> at 31). The 400,000 Deutsche Marks loan from Bancorex SA to SC Bravo MM'95 SRL was never

registered in the accounting of the company and was not repaid to Bancorex SA.  (Id.).

Loan to SC Bravo MM'95 SRL for Farm

On March 27, 1995, Manea, as administrator for SC Bravo MM'95 SRL, signed and submitted to Bancorex SA an application requesting the approval of a loan in the amount of 650 million lei. (Id.). She claimed that the loan was necessary for the purchase of a farm from a company named Ciorogarla SAI, in order to expand her food production activity for national and foreign trade.  (Id.). The loan was requested for a two-year repayment period. (Id.). Manea gave this application to her co-defendant Zega Macedon Anton at Bancorex SA, who forwarded it for analysis to the Commercial Customer Service and not to the Analysis and Tracking Commercial Guarantees Service, which was the group that should have reviewed it. (Id.).   On March 29, 1995, the Head of the Commercial Customer Service requested that the bank's Analysis and Tracking Material Guarantees Service verify the real estate guarantees that Manea had proposed in the loan application, which included a farm located in Ciorogarla Commune (for which Manea had requested the loan), a plot of land "and construction" pertaining to her property in Voluntari Commune referenced above, and a plot of land belonging to a third party. (Id.).

On March 30, 1995, the account administrator, Tita Lucia Mariana, at the request of Manea's codefendant Zega Macedon Anton, signed the loan note approving a loan of 650 million lei to SC Bravo MM'95 SRL. (Id.).[53]   The note was not signed by the Head of Commercial Customer Service, Tudor Carmen Laurentia, because, as she testified, she suspected that Manea and her two companies were "not serious[.]" (Id.).  The note was signed on behalf of Bancorex by only Manea's co-defendant Zega Macedon Anton.  (Id.). The

_____

[53]See note 49 supra.

loan convention paperwork stated that the loan was being granted for the purpose of purchasing and modernizing the farm in Cioragarla SAI Commune. (Id.).

The same day, the loan amount of 650 million lei was approved by Zega Macedon Anton and paid in cash to the accounts of SC Bravo MM'95 SRL. (Id.). Also the same day, as represented by the witness Tocco Paolo, Manea bought, in her personal capacity as not as administrator for any company, the farm located in Ciorogarla Commune for a purchase price of 15 million lei. (Id.). The farm consisted of three stables, a kitchen, two lanterns, and two grain storages. (Id.). The loan was not registered in the account books for the company. (Id. at 31-32).

SC Bravo MM'95 SRL Loan from International Bank of Religions for Meat Processing Equipment

On January 5, 1996, Manea, as administrator for SC Bravo MM'95 SRL, and her co-defendant Ciocan Marian, acting as director for the company, signed and submitted a loan application to the International Bank of Religions – SMB for 200 million lei to purchase some meat processing equipment, to be repaid within one year. (Id. at 32). The loan application attached several documents, including a trial balance for SC Bravo MM'95 SRL from November 1995 showing that the company did not have any other outstanding loans to reimburse (despite that there was an outstanding loan from Bancorex of 400,000 Deutsche Marks for the Volvo road trains); documents indicating that the investments in the "zoo technic" field were of approximately 2 billion Romanian lei; a balance sheet dated June 30, 1995, showing that the company was "very efficient" and had a number indicating registration with the Financial Administration in Sector 2 (but in fact that number had not been registered); and a contract for the sale of goods dated October 24, 1995, between Manea's two companies, SC Bravo MM'95 SRL as the supplier and SC Ando Exim SRL as the

beneficiary. (Id.).[54]

The Bucharest Court concluded that all of these documents were "forged" by Manea, in that they contained "untruthful data[]" that overstated the company's activity. (Id.). Manea also stated, in connection with the loan application, that she intended to populate farms in Ciorogarla and Valea Macrisului "with imported cows (Holstein) of great productivity." (Id.). With respect to the contract between Manea's two companies, she was the signatory for both companies and altered her signature for one of the companies so that both signatures would not look similar. (Id.).

On January 7, 1996, both Manea and Ciocan Marian signed a document that appears to be similar to a power of attorney, allowing Manea to represent SC Bravo MM'95 SRL Bucharest on her own. (Id.). On January 10, 1996, the International Bank of Religions approved a loan of 200 million lei to SC Bravo MM'95 SRL Bucharest in loan contract number 362. (Id.). Rather than using the loan amount to purchase meat processing equipment, as they stated in the loan application, Manea and Ciocan Marian did not register the loan in the company books. (Id. at 32-33). Manea attributed 135 million lei of the 200 million lei loan to SC Ando Exim SRL for payment on the price of meat and pastry processing equipment that SC Ando Exim SRL had allegedly "sold" to SC Bravo MM'95 SRL. (Id. at 33). The invoice for that equipment, which had been forged by Manea, showed that the equipment was worth

---

[54]As discussed above, in addition to witness statements, the court had before it the documents underlying the indictment, including the founding and functioning documents of Manea's two companies: SC Ando Exim SRL and SC Bravo MM'95 SRL (id. at 42, 47, 50, 53); loan files (see, e.g., Dkt. #61-1, at 44, 46-47, 50, 53, 55, 61, 63), trial balances issued by Manea (see id. at 47, 55); expert reports (see id. 47); payment orders (see id. at 45, 47, 55); accounting notes (see id. 47, 53); purchase invoices for vehicles (see id. 48); purchase contracts for a farm located in Ciorogarla Commune (see id. 51-52), four large Volvo road trains (see id. 48, 50, 61), and a mini hotel located in Busteni (see id. 56-57, 62); copies of guarantee contracts of real estate and mobile assets (see id. 53-54, 58, 64, 67); and balance sheets and other accounting documents (see id. 53-54, 60-61).

approximately 535 million lei, from which 360 million lei had already been paid, leaving 175 million lei remaining.  (Id.).

On April 1, 1996, Manea asked the International Bank of Religions if she could repay a portion of the loan in advance of its due date, in order to convince the bank that she was creditworthy. (Id.).  Manea paid the bank the amount of 33,991,197 lei through two payment orders from a company named SC Tabiti SRL, which Manea represented was the future buyer of the farm located in Ciorogarla. (Id.).  Co-defendant Ciocan Marian stated that Manea told him she had obtained the loan from the International Bank of Religions but that she no longer wanted to buy the meat processing equipment "because she found a family residence in Busteni[.]" (Id. at 42).

Loan from International Bank of Religions to SC Bravo MM'95 SRL for Mini Hotel

During April 1996, Ciocan Marian and Manea filed another loan application with the International Bank of Religions requesting 920 million lei to purchase a mini hotel with thirteen rooms in Busteni.  (Id. at 33). The loan was to be guaranteed by the hotel, two apartments in Bucharest, and the farm in Ciorogarla. (Id.). The farm had previously been offered as collateral to guarantee the loan of 650 million lei from Bancorex.  (Id.).  Ciocan Marian neglected to fill out the section of the application form describing the company's outstanding loans (id.), and attached to the loan application were two trial balances from December 1995 and February 1996, a balance sheet dated December 31, 1995 that was allegedly registered with the Financial Administration of Sector 2, and a fictitious agreement concerning the selling by SC Bravo MM'95 SRL to another company, SC Kacner SRL, four Volvo road trains with trailers. (Id.).  All of these attachments were signed by Manea. (Id.).  Through these documents, Manea was able to convince the bank that SC Bravo MM'95 SRL

was profitable, even though it had no business activity. (Id.). Part of the basis for the loan was the understanding that the mini hotel would be rented to Austrian tourists with the help of an exchange program between Romania and Austria. (Id.).

On April 14, 1996, SC Bravo MM'95 SRL bought from two owners the mini hotel in Busteni for the amount of 1,250,000,000 lei. (Id. at 34). The contract was authenticated and registered in the Registry of Transcriptions and Registrations in the county where the building was located. (Id.). Even though the contract set forth a price of 1.25 billion lei, the actual price SC Bravo MM'95 SRL paid for the property was 800 million lei. (Id.). The 800 million lei amount was registered with the Registry of Transcriptions in the county. (Id.).

On April 22, 1996, the International Bank of Religions approved the loan to SC Bravo MM'95 SRL in the amount of 920 million lei, so that the company could purchase the mini hotel. (Id. at 33). The bank opened personal accounts in the names of two of the hotel owners so that the bank could deposit the loan amount directly into those accounts. (Id. at 33-34). After the bank's interest in the property was recorded with government authorities, the bank was to "unlock" the personal bank accounts so the sellers could have access to the cash. (Id. at 34). On April 25, 1996, the bank and SC Bravo MM'95 SRL finalized the mortgage paperwork for the hotel. (Id.). The hotel was "evaluated" at a price of 700 million lei, a part of the 920 million lei loan. (Id.).

After the sale of the mini hotel was finalized for 800 million lei (despite that the contract said the sale price was 1.2 billion lei), 120 million lei remained from the 920 million lei loan. (Id. at 35). Manea requested that the International Bank of Religions pay 60 million lei to SC Bravo MM'95 SRL's account at Bankcoop SA – Brezoianu Branch to pay for goods that were listed in a fraudulent invoice. (Id.). That amount was paid on May 7, 1996. (Id.).

On May 9, 1996, Manea cashed 58 million lei from Bankcoop SA – Brezoianu Branch. (Id.). She told the bank that the money represented payment for "forages towards individuals[,]" but "in fact the amount was used by the defendant for other purposes tha[n] that of the destination granted by the bank, more precisely in the personal benefit." (Id.). Some of the remaining loan funds were used to pay for evaluations and insurance for the hotel property. (Id.).

In addition to the hotel building, Manea had pledged two apartments and the Ciorogarla farm as collateral for the 920 million lei loan. (Id. at 34). All of these properties had previously been pledged to Bancorex SA on March 31, 1995, to guarantee the 650 million lei loan for which Manea had previously applied. (Id.). Despite that these properties had already been pledged, paperwork was submitted in conjunction with the 920 million lei loan showing that the properties were free of any encumbrances. (Id.). Two other items of personal property, a Mercedes Benz vehicle and a Volkswagen mini bus vehicle, both owned by Ciocan Marian, were also pledged as collateral for the International Bank of Religions 920 million lei loan. (Id.).

According to the contract, the hotel building was not to be sold or offered as collateral to guarantee any other loan without the approval of the bank, so that the bank could foreclose on the property if the loan was not repaid. (Id.). Nonetheless, Manea later sold the hotel and other properties to a Turkish citizen, allegedly "in the view of obtaining loans from other banks." (Id. at 35).

Inheritance to Repay Loans

On May 6, 1996, Manea signed and submitted to Bankcoop SA – Brezoianu Branch, a loan application in the amount of 300,000 Deutsche Marks, claiming that she had to pay

notary and inheritance taxes in Austria because she had received an inheritance of three hotels. (Id. at 37). To guarantee this loan, Manea offered the mini hotel in Busteni, which was already pledged as collateral for another loan. (Id.). As support for the loan, Manea attached several forged documents that were drafted in German and translated into Romanian, from which it appeared that a person named Manea Virgil Teodor had left her three hotels valued at a total of 1.8 million Deutsche Marks. (Id.). According to the documents, the hotels were located within a tourist district. (Id.). The documents Manea provided to the bank said that Manea had to pay 325,000 Deutsche Marks to Austria Bank before she could take ownership of the hotels. (Id.). Additionally, Manea provided paperwork showing that the hotels had been sold to a "voyage company" but the "purchasing contracts [involving the voyage company] would be signed only after the documents would be certified in front of the notary by . . . Manea as owner of the hotels." (Id. at 38).

On June 19, 1996, co-defendant Ciocan Marian signed, in the name of SC Bravo MM'95 SRL, a report stating that the company officials have met and discussed offering the Busteni mini hotel as collateral for the loan of 325,000 Deutsche Marks. (Id. at 37). Ciocan Marian knew that the Busteni mini hotel had already been pledged as collateral to the International Bank of Religions for the 920 million lei loan it had given to SC Bravo MM'95 SRL. (Id.).

On June 26, 1996, Bankcoop approved the loan of 325,000 Deutsche Marks for a period of six months, so that Manea could pay some of the inheritance expenses. (Id. at 38). Manea requested that the loan amount be paid to her personal account at Austria Bank. (Id.). The Busteni hotel was pledged as collateral and Manea provided a fraudulent

certificate to show that the Busteni hotel was free of encumbrances, when in fact it was not. (Id.). Manea also pledged a Mercedes Benz vehicle that had likewise been pledged to the Bank of International Religions to secure the 920 million lei loan. (Id.). The final two items securing the 325,000 Deutsche Marks loan were a building belonging to Ciocan Marian and his wife and Ciocan Marian's Volkswagen mini bus, which had also previously been pledged as collateral for the 920 million lei loan. (Id.).

On August 2, 1996, Manea, acting as administrator for SC Mon Chery Prod Com SRL, signed a payment order from that company to SC Bravo MM'95 SRL's account at the International Bank of Religions for 100 million lei as an "advance for the farm." (Id. at 35). Manea told the bank that SC Mon Chery Prod Com SRL was a potential buyer for the Ciorogarla farm. (Id.). The International Bank of Religions withheld the 100 million lei as payment for SC Bravo MM'95 SRL's debts and interest. (Id.). According to the extradition request, this 100 million lei payment was the only payment ever made to any bank for repayment of any of the loans Manea and her companies received. (Id.).

Bank employees apparently tried to locate Manea several times regarding repayment and she stated that she would repay the loans when she received an inheritance from the estate of her deceased uncle, Manea Virgil Teodor. (Id.). Manea told the bank employees that her inheritance was in the sum of 1.8 million Deutsche Marks and was to be distributed by Austria Bank. (Id.). Manea opened a bank account into which the inheritance was to be deposited. (Id.).

The International Bank of Religions asked Manea for the balance sheet and monthly trial balances for SC Bravo MM'95 SRL's activity during the first six months of 1996. (Id. at 35-36). On October 24, 1996, Manea gave the bank a statement showing that the company

"no longer had activity as a consequence of some misunderstandings. . . . " (<u>Id.</u> at 36). On November 11, 1996, the bank requested information from Austria Bank about the supposed inheritance, which was to be used to pay the balance of the loan. (<u>Id.</u>). Austria Bank told the International Bank of Religions that there was no account in the name of Manea Virgil Teodor, and hence no activity in this account. (<u>Id.</u> at 36, 39). Evidence gathered during the prosecution showed that Manea never received any kind of inheritance from Austria. (<u>Id.</u> at 39). Further, the address at which Manea's uncle allegedly lived had not existed since 1985, when the building was demolished. (<u>Id.</u> at 39-40).

Loan to SC Bravo MM'95 SRL for Commercial Space

On October 12, 1995, Manea, as administrator for SC Bravo MM'95 SRL, entered discussions with SC Universal SA Bucharest to buy a commercial space in Bucharest. (<u>Id.</u> at 36). Manea stated that she would obtain a loan to cover the purchase price. (<u>Id.</u>). SC Universal Bucharest approved the purchase on October 17, 1995, and told Manea that the accounting value of the building was 654 million lei and the market price was 1.3 billion lei. (<u>Id.</u>). After learning of these prices, Manea ceased further communication with SC Universal and "showed no interest in purchasing the commercial space." (<u>Id.</u>).

In late March 1996, Manea, as administrator for SC Bravo MM'95 SRL, submitted a loan application to Bankcoop SA – Brezoianu Branch, for a loan of 100 million lei for one month in order to buy a store. (<u>Id.</u>). Manea attached "a study of the company mentioning that the company had intense production activities in relation with the Cioragarla" farm and another farm that bred cattle. (<u>Id.</u>). Manea's application stated that she had received several offers to purchase commercial spaces and that she had paid an advance of 8 million lei to purchase a particular space. (<u>Id.</u>). Manea also attached a budget plan showing that she

expected to make 600 million lei in 1996 through the venture and forged paperwork showing that SC Bravo MM'95 SRL had an offer to sell Volvo trucks. (Id.). She produced an invoice (number 0124589/2.04.1996) showing that SC Bravo MM'95 SRL had sold four Volvo road trains to a company called SC Tabiti Com SRL Bucharest (which was associated with co-defendant Ciocan Marian) for 1.4 billion lei. (Id.). To guarantee to the loan, Manea pledged a property in Bucharest that had previously been pledged to the International Bank of Religions, as "transcribed to the Registry of Transcriptions and Registrations[.]" (Id. at 37). Manea did not notify Bankcoop SA – Brezoianu Branch that the property had previously been encumbered. (Id.). On or about April 5, 1996, Bankcoop approved the 100 million lei loan with a repayment date of one month. (Id.). Manea drafted a payment order for the bank to direct the payment of 95 million lei to an account opened at Bucharest Bank, SA for the purchase of commercial space. (Id.). Manea represented to the bank that the account at Bucharest Bank was in the name of SC Universal SA, but in reality the owner of the bank account was Manea. (Id.). SC Universal SA provided a statement that it "did not have nor has in present any account to Bucharest Bank." (Id. at 42). The 95 million lei from Bankcoop and the 50 million lei that was already in the Bucharest Bank account was spent by Manea on things other than the proposed commercial space, and "[s]ome of the money was given to . . . defendant Coican Marian to buy construction materials for his house[.]" (Id. at 37). Additionally, the 100 million lei loan was not registered in the accounting books of SC Bravo MM'95 SRL. (Id.).

### ii. CONCLUSIONS OF BUCHAREST COURT & EVIDENCE RELIED THEREON

In support of her contention that Romania has not presented sufficient evidence to establish probable cause, Manea relies on In re Ribaudo, 2004 WL 213021 and In the Matter

of the Extradition of Ernst, 1998 WL 395267. (Dkt. #38, at 43; Dkt. #60, at 6-7).  In In re

Ribaudo, Ribaudo, a citizen of Italy, was arrested in New York in 2011 pursuant to a request

for extradition arising out a 1985 conviction in Italy for conspiracy to commit narcotics

trafficking and possession, exportation and sale of narcotics.  2004 WL 213021, at *1-2.

Ribaudo, like Manea, was tried in absentia.  Id.  The provisions of the governing Treaty in

that case "indicate that, . . . when a person has been convicted in absentia, a judgment of

conviction, while pertinent to an analysis of the sufficiency of evidence, is not conclusive

proof of probable cause to extradite."  Id. at *4.  That court found that "[c]onsequently,

when a person has been convicted in absentia, an inquiry conducted pursuant to section

3184 must include an independent determination of probable cause based upon evidence

which provides, in the words of [that] Treaty, 'a reasonable basis to believe that the person

sought committed the offense for which extradition is requested.'" Id.  The Ribaudo court,

relying on Second Circuit precedent, continued that "the conviction is merely a charge and

an independent determination of probable cause to extradite must be made[.]" Id., citing

Gallina v. Fraser, 278 F.2d 77, 79 (2d Cir.), cert. denied, 364 U.S. 851, reh. denied, 364 U.S.

906 (1960); Ernst, 1998 WL 395267, at *7.

    With respect to its request for extradition, Italy provided the decision of the Court of

Appeal of Florence, a summary of the case, the post-conviction arrest warrant issued in

Florence in 1987, and the relevant provisions of the Italian criminal and penal codes.  Id. at

*5. However, neither the documents nor the explanation for the code words and

statements[55] referenced in the decision of the Florence Court of Appeal were presented to

---

[55]The evidence in that case was based on wiretapped phone calls in coded language and
letters that allegedly concerned drug trafficking; the Florence Court of Appeal stated that it was
"considered proven" that Ribaudo had conveyed messages about drug trafficking, however, the
court did not provide summaries of that evidence. Id. at *6.

the court.  Id. at *6-7. Thus, the court concluded that the government did not satisfy its burden of establishing probable cause. Id. at *7.

In Ernst, similar to the facts in this case, Ernst, accused of committing a series of fraudulent securities transactions in Switzerland in the late 1970s and early 1980s, immigrated to the United States in 1983 and was indicted in Switzerland in 1989.  1998 WL 395267, at *1-2.  Ernst requested to be excused from personally appearing at his trial, and he was tried and convicted in absentia.  Id. at *2.  He became a naturalized citizen in 1990, and was convicted and sentenced in Switzerland on September 3, 1991.  Id.  The Swiss Government requested extradition in 1995, but such request was subsequently withdrawn; on November 7, 1997, the Swiss Government transmitted a request for a provisional arrest warrant to the United States. Id.  Ernst was arrested in the United States on December 30, 1997.  Id.  In support of extradition, the Swiss Government submitted fingerprints and photographs, a copy of the indictment, a copy of the decision of the Zurich Supreme Court and translations of the relevant statutes.  Id. at *3. In his decision, Magistrate Judge Robert Pitman found that the only evidence of Ernst's criminal activity was the decision by the Zurich Supreme Court, and that decision did "not, for the most part, describe the evidence on which its decision [was] based."  Id. at *10.  He found that, therefore, it was "impossible to determine the veracity and bases of knowledge of the witnesses and the documentary evidence that underlie the decision[,]" and while the decision contained cites to documentary exhibits, those exhibits were not described, and the "statements of 'fact' in the opinion [were] actually the conclusions that the Zurich Supreme Court has drawn from the exhibits."  Id.  Thus, Magistrate Judge Pitman concluded that without the underlying evidence, "there [was] no basis on which the Court [could] make the required independent determination as

to whether probable cause exists." Id. (citation omitted).

Conversely, however, in Haxhiaj, the Fourth Circuit held that "for an extradition request based upon a conviction in absentia, the Treaty [in that case] require[d] more detail than mere proof of the fact of conviction to establish probable cause, . . . but it clearly [did] not require the kind of actual evidence suggested by Haxhiaj, such as trial testimony or transcripts of the wiretap evidence." 528 F.3d at 289 (emphasis in original). Although Manea claims that the Treaty in this case requires separate evidence supporting probable cause when a defendant has been tried in absentia, the terms of the Treaty require "such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought. " (Dkt. #1, Extradition Treaty, Art. 8 ¶¶ 3(a)-(c)).[56] In its decision, the Bucharest Court also addressed evidence upon which it relied to disprove the defenses Manea provided during questioning in the "first stage of investigations[.]" (Dkt. #1, Exh. 1, Att. B at 38).[57] The court found that "it was established with certainty that the information [Manea] provided to the [three] banks [to obtain loans] . . . was forged." (Id.). The companies, SC Ando Exim SRL and SC Bravo MM'95 SERL "were not undertaking any kind of economic or commercial activity," even though Manea presented the companies "as very profitable companies with possibilities to reimburse the loans." (Id.; see also id. at 40 (feasibility studies, documents and invoices, and accounting documents,

---

[56]See Section I.D.4.a. supra.

[57]In Manea's statement given on November 9, 1995, she reported that she look a loan to purchase a hall and house owned by a third party. (Dkt. #52, Exh. 3 at 31). She paid that loan in approximately two or three months and then requested another loan, for which she used two buildings and "other assets" as security. (Id.). What she purchased, however, was illegible (id.), and there is no statement from Manea about the loans she took that were the subject of the indictment. Additionally, this statement predates the criminal proceedings by approximately two years.

stated that she was making "substantial profits[]").  Additionally, the court noted that "[i]n some cases the loan applications were accompanied by feasibility studies drafted and signed by [Manea] from whom it appeared that her companies made considerable investments, acquisitions of equipment, commercial spaces decorations and production[.]" (Id. at 38). In the situations where "feasibility studies" were not required, Manea "presented to the banks forged invoices and other false documents in order to prove that she had access to large amounts of money resulting from sales or to justify the obtaining of the loan." (Id. at 39; see id. at 40 ("Even though the balance sheets appeared to have registration numbers from the Financial Administration of Sector 2 Bucharest following investigations by the police (report on pages 22-24 of the Criminal Investigation file), the documents were not found on the data basis of the Financial Administration of Sector 2.")).  Witnesses Dudu Anisoara, Dragnea Corneliu, Oana Camelia and Stanescu Elena testified before the court that Manea requested loans and presented accounting documents that represented the companies as having the ability to repay the loans in full.  (Id. at 40; see Dkt. #61-1, at 62-63, 66-67).[58] In this case, contrary to the facts in Ernst, 1998 WL 395267, at *10, the Bucharest opinion is thorough and the court describes the evidence in detail, citing to loan numbers; founding and functioning documents of Manea's two companies; certificate numbers; loan files and trial balances submitted by Manea; purchase invoices and purchase contracts; as well as balance sheets,  account numbers and accounting notes. See id. (concluding that a decision from the Swiss court was insufficient to support a probable cause finding because the Swiss court failed to "describe the evidence on which it [was] based[]").  Throughout the court's

---

[58]Additionally, the court noted that Manea was assisted in many of her frauds by a notary public, who was also indicted and whose case was severed from that of the other defendants. (Id. at 41).

decision, page numbers of the criminal prosecution file, page numbers of the criminal investigation file, and page numbers of witness testimony from the court file are cited, and details are discussed.[59] Contrary to Manea's argument, the Bucharest Court's decision is far from conclusory, and the decision's details delve deeper than a broad summary of evidence.

Manea's requirement of separate evidence goes beyond the terms of the Treaty as "[t]here is nothing in the [T]reaty that requires that proof submitted be of a particular kind[.]" In re Zhenley Ye Gon, 768 F. Supp. 2d at 88. Accordingly, this Court cannot disregard the judicial findings of the Bucharest Court merely because it does not have the underlying files to which the court refers in its decision, and because it does not have the transcripts of witnesses' testimony, but instead has excerpts of statements and testimony. See id. ("[A]ll would agree that the treaty cannot possibly be interpreted to permit the requested states to render null and void judicial findings merely because the court that issued them cho[]se to excerpt the statements of witnesses upon which it was relying as opposed to setting them forth in full and did not attach the complete sworn statements."). Similarly, "[i]t is inconceivable that the signatory parties would intend that judicial findings sufficient in themselves in either country would somehow not be sufficient to warrant extradition from one to the other." Id. at 88-89, citing Haxhiaj, 528 F.3d at 289-91.

---

[59]The Bucharest Court found that, because of Zega Macedon Anton's lack of a prior criminal record, presence during trial, and relative culpability, he should be sentenced "towards the minimum" penalty for his offenses. (Id. at 50). He was sentenced to three months' imprisonment. (Id. at 57).

Co-defendant Ciocan Marian stated that he believed the money and items Manea gave him were earned by the companies that Manea was running. (Id. at 51). The Romanian Court did not find this statement credible. (Id.). Ciocan Marian also noted that Manea said she would obtain another loan so that he could finish construction on his house. (Id. at 52). The Court found that because of Ciocan Marian's attitude during the investigation, his provision of information to the authorities, his presence at trial, and his relative culpability, he should be sentenced "toward the minimum" penalty for his offenses. (Id. at 53). He also was sentenced to three months' imprisonment. (Id. at 57).

Additionally, the evidence cited to and summarized in the Bucharest Court's decision is the type of evidence that federal courts have repeatedly found sufficient to establish probable cause. See id. at 89, citing Haxhiaj, 528 F.3d at 289-91 (excerpts of Italian appeals court decision that contained detailed description of evidence against fugitive sufficed); Afanasjev v. Hurlburt, 418 F.3d 1159, 1163-66 (11th Cir.)(unsworn 106-page foreign bill of indictment, which contained "detailed" summaries of witness statements and other hearsay evidence, was "sufficiently reliable evidence" on which to base probable-cause finding), cert. denied, 546 U.S. 993 (2005); Zanazanian v. United States, 729 F.2d 624, 627 (9th Cir. 1984)(summaries of witness statements and other evidence contained in police reports sufficed); United States v. Justik, No. 805MK319TEAJ, 2005 WL 3185966, at *9-10 & n.20 (M.D. Fla. Nov. 29, 2005)(finding probable cause based on description of evidence in foreign arrest warrant and summary report of evidence collected by prosecution; documents referenced in arrest warrant and Summary Report but not attached to the request for extradition were not necessary to establish probable cause)(other citations omitted). After a thorough consideration of the factual findings in the Bucharest Court decision, the indictment, the forensic accountant's report, the history of the case, and the relevant text from the criminal code, and bearing in mind that the evidence needed to extradite a fugitive differs greatly from the evidence needed to convict a defendant, this Court concludes that the foregoing information provided pursuant to Article 8 of the Treaty suffices to establish probable cause. Haxhiaj, 528 F.3d at 289 (the Extradition Treaty requires "merely a summary of the facts and relevant evidence sufficient to provide a reasonable basis to believe the relator committed the offense[,]" and a certified copy of the appellate opinion from Italy satisfied the Treaty requirements and "clearly affords a reasonable basis upon

which to find probable cause[]"); Collins, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.")(multiple citations omitted).

### 5. ARTICLE 4: POLITICAL OFFENSE

Article 4 of the Extradition Treaty bars extradition if the offense for which extradition is requested is a political offense.  (Dkt. #1, Extradition Treaty, Art. 4(1)). The issue of "[w]hether an extraditee is accused of an offense of a political nature is an issue for judicial determination."  Ahmad v. Wigen, 910 F.2d 1063, 1066 (2d Cir. 1990)["Ahmad II"](citation omitted). Political offenses fall within two classes: "'pure' or directly political, and . . . 'relative' or incidentally political."  Ahmad v. Wigen, 726 F. Supp. 389,  401 (E.D.N.Y. 1989) ["Ahmad I"], aff'd 910 F.2d 1063 (2d Cir. 1990).  A "pure" political offense is an offense "directed against the state and involves none of the elements of ordinary crime." Id.   An act is a "relative" political offense when it is "an otherwise common crime committed as a political act or for political motives or in a political context." Id. (multiple citations omitted).

Manea "vehemently denies the alleged charges against her[,]" but she argues that "[a]ssuming, . . . for present purposes that she committed the alleged offenses, those offenses were committed in a political context." (Dkt. #38, at 53; see id. 53-55).  In this case, Manea was charged and convicted of fraud offenses.  When the crimes are "not political on [their] face," the fugitive bears the burden of proving that her criminal acts fall with the political offense exception provided in the Treaty, and she must establish the elements of the political offense exception by a preponderance of the evidence.  See Ahmad I, 726 F. Supp. at 408 (citation omitted)(accused must show link between crimes and political

objective and the burden does not shift to the government until accused shows evidence of conflict and membership in a political objective)(citations omitted).  The test proving that a crime is a relative political offense has two components: "the 'uprising' requirement and the 'incidental to' requirement."  Quinn v. Robinson, 783 F.2d 776, 806 (9th Cir.), cert. denied, 479 U.S. 882 (1986).  There must be an "uprising, rebellion, or revolution," and the criminal offense must be "incidental to[,]" meaning, "in the course of," "connected to," and "in furtherance of" the "uprising, rebellion, or revolution."  Id. at 806, 809 (citations & internal quotations omitted).

Manea contends that at the time the alleged crimes were committed, Romania was in a state of "utter lawlessness" following the "fall of the Communist regime[.]"  (Dkt. #38, at 53-54).  She asserts that the fact that she was "prosecuted, tried in her absence, sentenced to nine years in prison, and hunted down [twenty-two] years after the fact[,]" must be considered in light of the political context and the fact that she was "a long-standing anti-communist, single-mother, divorcee, [who was an] outspoken dissident and critic of [then-President] Iliescu[.]" (Id. at 54-55).

As an initial matter, the law is well settled that political motivations of the requesting state may not be considered by an extradition court, but rather, is a "matter better left to the Executive's discretion."  Eain v. Wilkes, 641 F.2d 504, 516 (7th Cir.), cert. denied, 454 U.S. 894 (1981).  Moreover, "[c]riminal conduct in the nature of financial fraud, even involving political corruption, traditionally has been considered outside the 'political offense' exception."  In re Extradition of Sacirbegovic, No. 03CR MISC 01PAGE1, 2005 WL 107094, at *20 (S.D.N.Y. Jan. 19, 2005), citing Koskotas v. Roche, 931 F.2d 169, 172 (1st Cir. 1991); see Sindona v. Grant, 619 F.2d 167, 173-74 (2d Cir. 1980)(Italian charge of "fraudulent

bankruptcy" is not of a political character even when the relator contends that it "resulted from political maneuverings and is [being] pursued for political reasons"); Jihrad, 536 F.2d at 485 ("[I]t is surely beyond dispute that the embezzlement of money from [a public fund] which [relator] as a public servant was responsible for administering, is not in any sense a political offense."); Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971)(embezzlement by an official of the Peruvian government is not a political offense), cert. denied, 405 U.S. 989 (1972). Accordingly, the political offense exception under the Extradition Treaty does not extend coverage to the criminal offenses for which Manea was convicted.

### E. DUE PROCESS CONSIDERATIONS & THE RULE OF NON-INQUIRY

To the extent that Manea argues a violation of due process in the delay in issuing the formal request for extradition, no such independent due process rights exist. In re Extradition of Drayer, 190 F.3d 410, 415 (6th Cir. 1999)(due process rights not infringed by Canada's fourteen-year delay between the issuance of the Canadian arrest warrant and Canada's formal request for extradition), cert. denied, 528 U.S. 1176 (2000); Kamrin, 725 F.2d at 1228 (unless extradition treaty itself guarantees full United States rights to due process, they do not apply). Similarly, there is no right to a "speedy extradition[,]" and if such right existed, it would "conflict directly with the rule of non-inquiry[.]" Martin v. Warden, Atlanta Pen, 993 F.2d 824, 829 (11th Cir. 1993).

The rule of non-inquiry has been the subject of discussion in dicta dating back to 1960, when the Second Circuit first intimated that the rule of non-inquiry may not apply where a defendant faces procedures in a foreign country "antipathetic to a federal court's sense of decency[.]" Gallina, 278 F.2d at 79; see Prushinowski v. Samples, 734 F.2d 1016,

1019 (4th Cir. 1984)(extradition may be barred if "the prisons of a foreign country regularly opened each day's proceedings with a hundred lashes applied to the back of each prisoner who did not deny his or her [deity] or conducted routine breakings on the wheel for every prisoner[]"); In re Extradition of Burt, 737 F.2d 1477, 1487 (7th Cir. 1984)(due process challenges may be founded on "exceptional constitutional limitations as may exist because of particularly attrocious [sic] procedures or punishments employed by the foreign jurisdiction[]")(multiple citations omitted). However, in 1990, the Second Circuit embraced the rule of non-inquiry even while relying on Gallina. Amhad II, 910 F. 2d at 1066. In Ahmad II, the Second Circuit emphasized that "[a] consideration of the procedures that will or may occur in the requesting country is not within the purview of the . . . judge[,]" id., citing Gallina, 278 F. 2d at 79, and observed that, in fact, "there is substantial authority for the proposition that this is not a proper matter for consideration by the certifying judicial officer." Id.; see Jhirad, 536 at 484-85 ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation."). The Second Circuit also admonished the district court from taking testimony from expert and fact witnesses, affidavits, and other documents concerning the requesting country's law enforcement procedures and its treatment of prisoners. Ahmad II, 910 F.2d at 1067.[60]

More recently, the U.S. Supreme Court reiterated that it is the role of the Executive Branch, not the Judiciary, to "decline to surrender a detainee for many reasons, including

---

[60]Moreover, this Court is aware of no federal court decision that has blocked extradition on the "decency" grounds articulated in Gallina.

humanitarian ones." <u>Munaf v. Geren</u>, 553 U.S. 674, 702, <u>reh. denied</u>, 554 U.S. 939 (2008).[61]

As the U.S. Supreme Court stated: "The Judiciary is not suited to second-guess such determinations –– determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." <u>Id.</u>, <u>citing</u> The Federalist No. 42, p. 279 (J. Cooke ed. 1961)(J. Madison)("If we are to be one nation in any respect, it clearly ought to be in respect to other nations.")[62]; <u>see also Ahmad II</u>, 910 F.2d at 1067 ("It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds.")(multiple citations omitted); <u>Cheung</u>, 213 F.3d at 88 (same). <u>See Prasoprat v. Benov</u>, 421 F.3d 1009, 1016 (9th Cir. 2005)("We have long adhered to the rule of non-inquiry-that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state.")(citations omitted), <u>cert. denied</u>, 546 U.S. 1171 (2006).

Additionally, non-inquiry cases about the criminal process, including the existence of <u>in absentia</u> proceedings and complaints about conditions of confinement, are rejected. John T. Parry, <u>International Extradition, the Rule of Non-Inquiry, and the Problem of Sovereignty</u>, 90 B.U. L. REV. 1973, 1988-89 (2010)(collecting cases). Moreover, while "several courts have taken the . . . step of suggesting a 'humanitarian exception' to the non-inquiry doctrine[,]" <u>id.</u> at 1993 (collecting cases), "[n]o court has ever applied the exception as the basis for refusing extradition." <u>Id.</u> at 1993-94; <u>see Prasoprat</u>, 421 F.3d at 1016 (citations

---

[61]Although <u>Munaf</u> concerned the transfer of military detainees, the Court's discussion of the rule of non-inquiry was central to its holding.

[62]The Supreme Court added: "In contrast, the political branches are well suited to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." <u>Id.</u>

omitted)("We have, on occasion, cited the possibility of a humanitarian exception to extradition; however, we have never actually 'relied on it to create' such an exception.")(citations omitted).

Thus, while this Court is constrained from considering Manea's due process[63] and humanitarian arguments,[64] consistent with the Second Circuit's holding in Ahmad II, this Court emphasizes to the Secretary of State that "in the face of proof that the extraditee would be subjected to procedures or punishment antipathetic to a federal court's sense of decency[,]" it would be "difficult to conceive of a situation in which the Secretary of State" would direct extradition.  910 F.2d at 1067 (citations omitted).  Despite the conclusion reached in this Ruling, the Secretary of State has the sole discretion to determine whether or not Manea, a naturalized United States citizen,[65] should actually be extradited.  See 18 U.S.C. § 3186 ("The Secretary of State may order the person committed under section [] 3184 . . . of this title to be delivered to any authorized agent of such foreign government . . . .")(emphasis added).  The Secretary may decline to surrender Manea on "any number of

---

[63]Manea similarly argues that she never received notice of the charges against her, while she was under investigation, immediately prior to the trial, during the trial, and immediately after the trial, when she could have taken an appeal, and Romania never adequately explained what steps it took to locate her, especially because she had been in frequent contact with Romanian law enforcement officials regarding her whereabouts during much of the time period at issue here, so that she cannot be called a "fugitive."  (Dkt. #38, at 56-60 & Exh. P at 6-11).

[64]In her brief, Manea has detailed the alleged corruption within the Romanian government, including its judiciary, and the horrific conditions of its prison system.  (Dkt. #38, at 4-19, 65-68).

[65]As referenced above, attached to Manea's brief are twenty-five letters of support for Manea, who is repeatedly described as a kind, thoughtful, and respected member of her community; one of these letters was submitted by a well-known celebrity.  (Dkt. #38, Exh. N).  She has worked for fifteen years as the First Assistant to a veterinarian at the Ridgefield Animal Hospital, and is an active member of her Christian Orthodox church.  (Id.; see also Dkt. #38, at 26-30). Additionally, as detailed above, see note 5 supra and accompanying text, Manea has remained on bond throughout this proceeding and her multiple requests to travel for religious and family commitments have been granted absent objection from the U.S. Probation Office and the U.S. Attorney's Office.

discretionary grounds, including, but not limited to, humanitarian and foreign policy considerations." U.S. v. Kin-Hong, 110 F.3d 103, 109-10 (1st Cir. 1997)(citations omitted).[66]

"Of course, the Secretary may also elect to use diplomatic methods to obtain fair treatment" for Manea, and the "State Department alone, and not the judiciary, has the power to attach conditions to an order of extradition." Id. (multiple citations omitted).[67]

## II. CONCLUSION

For the reasons stated above, the Government's Motion for Request for Extradition (Dkt. #32) is granted, albeit reluctantly, see Section I.E. supra.[68]

---

[66]See notes 63-65 supra.

[67]Without citing a specific provision in the Extradition Request, the Government states that Manea must be retried upon her request if she is extradited because she was tried in absentia before the Bucharest Court. (See Dkt. #32, at 5, n.2).

Article 522(1) of the Romanian Criminal Code, entitled "Re-trial of persons tried in their absence in case of extradition" provides: "In case the extradition . . . on the basis of a European Arrest warrant of a person tried and convicted in his/her absence is required, the case may be re-tried by the court which tried at first instance, at the request of the convicted person." (Dkt. #1, Exh. 1, Att. A at 11). This provision, as Manea correctly points out, is discretionary. (Dkt. #38, at 64). Manea argues that "Romania has not guaranteed to the United States that . . . Manea will receive a retrial and indeed she very well may not get a retrial[,]" and she "is not guaranteed a retrial or any specific procedural safeguards if she is returned to Romania[.]" (Dkt. #38, at 64, 70).

Articles 404 provides, inter alia, upon retrial, the court "may suspend on good grounds, totally or partially, the execution" of the previous court decision. (Id. at 11). Articles 405-08, which apply to Article 522 (see id. (under Article 522(2), the provisions of Articles 405-08 "shall apply accordingly[]") provide, inter alia, that upon retrial "[i]f it finds it necessary, the court administrates again the evidences collected during the first trial . . . "; "[i]f it finds the revision request justified, the Court cancels the decision to the extent to which the revision was admitted or the decisions which cannot be reconciled and pronounces a new decision . . . "; and the new decision and sentence are subject to the "same ways of attack as the decisions which are the subject of revision[.]" (Id. at 11-12).

The fact that a retrial is not mandatory is yet another consideration for the Secretary of State when deciding whether to surrender Manea. In the event that extradition is ordered, despite the multiple compelling reasons not to, see notes 63-65 supra, a mandatory retrial is a condition upon which the Secretary of State should insist, especially given the death of many of the witnesses and the dissolution of the banks which provided the loans to Manea.

[68]The Court wishes to extend its deepest appreciation to Assistant U.S. Attorney Sarala Vidya Nagala and Federal Public Defender Kelly M. Barrett for their remarkably well written briefs

61

Dated at New Haven, Connecticut, this 1st day of March, 2018.


                                      _/s/ Joan G. Margolis, USMJ_____
                                      Joan Glazer Margolis
                                      United States Magistrate Judge

---

regarding this sensitive and complex matter, and for the professional courtesy that they continuously have accorded to each other and to the Court.  This District is indeed lucky to have both Attorneys Nagala and Barrett appear regularly before it.

In light of her pending retirement in another eight weeks, this Magistrate Judge also wishes to use this opportunity to extend her profound gratitude to Monica Watson Cucchiarelli, her extraordinarily talented career law clerk, for her invaluable contribution on this file, and the literally hundreds and hundreds of files on which she has worked, so diligently and so thoroughly, for more than fifteen years.